## NELLIE MAUDE JONES *v.* S. JACK SUGAR ET AL.

[No. 581, September Term, 1972.]

*Decided June 6, 1973.*

The cause was argued before ORTH, C. J., and THOMPSON and MENCHINE, JJ.

*Robert A. Diemer,* with whom were *Bill L. Yoho, Robert S. Hoyert, Roy W. Hooten, Joseph F. McBride, Kenneth A. Lechter* and *Hoyert, Diemer, Yoho, Hooten & McBride* and *Calvin E. Cohen* and *Wright & Cohen* on the brief, for appellant.

*Joseph Montedonico* and *James A. Welch,* with whom were *William A. Ehrmantraut* and *Donahue & Ehrmantraut* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court.

I

## LIMITATIONS OF ACTIONS

### Fraudulent Concealment

"All actions of account, actions of assumpsit, or on the case, except as hereinafter provided, . . . shall be commenced,

sued or issued within three years from the time the cause of action accrued . . . ." Code, Art. 57, § 1. An exception is provided in § 14: "In all actions where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with ordinary diligence might have been known or discovered."

On 13 December 1971 NELLIE MAUDE JONES (appellant) commenced an action based on medical malpractice in the Circuit Court for Prince George's County against S. JACK SUGAR, M.D., and EUGENE LELAND MEMORIAL HOSPITAL, a body corporate (appellees). The first count of the declaration brought an action in tort against both appellees, and the second and third counts alleged the breach of an implied warranty on the part of Sugar and the Hospital, respectively. Each of the appellees filed general issue pleas, Maryland Rule 342 b, and a special plea of limitations, Rule 342 c 1 (d) and c 2 (a). Appellant did not file a replication. Rule 312. On 30 June 1972 the Hospital filed a motion for summary judgment, and on 11 August Sugar so moved. Each alleged that the action had not been filed within the period permitted by the statute of limitations. The court granted the Hospital's motion on 30 August and Sugar's motion on 26 September.

In her brief and in oral argument before us, appellant attempts to invoke the provisions of Code, Art. 57, § 14 to toll the period of limitations established by § 1. The exception is not available to her. Section 14, by its own terms, is made to apply only in those cases where two conditions are shown to exist: where a party (1) has been kept in ignorance of his cause of action by the fraud of the adverse party, and (2) has exercised usual or ordinary diligence for the discovery and protection of his rights. For fraudulent concealment to be invoked, the replication of the plaintiff to a plea of limitations must affirmatively show that the plaintiff was kept in ignorance of his right of action by the fraud of the defendant, and specifically aver:

(1) how the defendant kept the plaintiff in ignorance of his right of action; and

(2) how the plaintiff made the discovery of the fraud; and

(3) why the plaintiff did not make the discovery sooner than he did; and

(4) what diligence the plaintiff exercised to discover the fraud.

*Piper v. Jenkins,* 207 Md. 308, 319. *Piper* is quoted with approval in *Mettee v. Boone,* 251 Md. 332, 338-339, and summarized and followed in *Leonhart v. Atkinson,* 265 Md. 219, 226-227. The requirements necessary to invoke § 14 are not present in the case before us; no replication was even filed. In fact, the words "fraud" or "fraudulent" are not used in any of appellant's pleadings. See *Brack v. Evans,* 230 Md. 548.

### *The Rule of Limitations in Professional Malpractice Actions*

As the exception provided by § 14 is not to be applied, the issue of limitations must be resolved under § 1. Under that statute the action may be barred if not commenced within three years from the time the cause of action accrued. The initial question is, therefore, when did the cause of action accrue?

The general rule is that the statute of limitations begins to run from the date of the wrong. *Killen v. Geo. Wash. Cemetery,* 231 Md. 337, 343. There are exceptions to the general rule. In addition to the fraudulent concealment exception provided by statute, there are two exceptions applicable by judicial decision in this jurisdiction to cases of medical malpractice. The first is that " . . . if the treatment by the doctor is a continuing course and the patient's disease or condition is of such a nature as to impose on the doctor the duty of continuing treatment and care, the statute [of limitations] does not commence running until treatment by the medical man for the particular disease or condition involved has terminated . . . ." *Waldman v. Rohrbaugh,* 241

Md. 137, 140. The second exception is both a proviso to the first exception and the rule when there is no continuing course of treatment. As stated, where there is a continuing course of treatment, the statute does not commence running until the treatment is terminated. The second exception adds this condition: " . . . unless during the course of treatment the patient learns or should reasonably have learned of the harm, in which case the statute runs from the time of knowledge, actual or constructive." *Id.*, 140-141. "[W]here there is no continuing course of treatment and the injury does not become immediately known by or apparent to the patient, the statute begins to run in favor of the doctor only when the injury is, or reasonably should have become, known . . . ." *Id.*, 141. The second exception espouses the doctrine known as the "discovery rule." [1]

Our inquiry turns to what is meant by the "harm" or "injury" as used in the second exception, which, upon becoming known, actually or constructively, by the patient, starts the running of the period of limitations. As we understand it, Sugar would have us construe "harm" or "injury" literally as an "untoward injury or result from a medical procedure." He expressly repudiates that the action does not accrue until the patient was aware, or should have been aware, that the injury reasonably was due to malpractice.

We find it clear from the decisions of the Court of Appeals that it is not the mere discovery by the patient that he is injured that starts the statute running, but the knowledge, actual or constructive, that he may have the basis for an actionable claim as a result of the injury. In *Hahn v.*

---

**1.** We discuss the exceptions in terms of medical malpractice as within the frame of reference of the case before us. The Court of Appeals has recognized the theory of the continuation of events, only the last of which starts the running of the statute, in construing "the time the cause of action accrued" in cases not involving malpractice. *Waldman v. Rohrbaugh, supra,* at 141-142, quoting *Vincent v. Palmer,* 179 Md. 365, 374, and *W., B. & A. Elect. R.R. Co. v. Moss,* 130 Md. 198, 204-205.

The "discovery rule", although first applied to medical malpractice cases, *Hahn v. Claybrook,* 130 Md. 179, has been held applicable to cases involving cases of all kinds of professional malpractice. *Leonhart v. Atkinson, supra,* at 224 and cases there cited.

*Claybrook, supra,* the Court said, at 186: The discoloration of her skin of which she complained to her husband in 1908, was a sufficient indication of an injury, to have put her upon notice and inquiry, and it is clear from the evidence that if she had exercised ordinary care and diligence to have ascertained her rights she could have discovered *the cause of her alleged injury.*" (emphasis added). In *Waldman v. Rohrbaugh, supra,* at 145, after concluding that " . . . the right of action for injury or damage from malpractice may accrue when the patient knows or should know he has suffered injury or damage," the Court stated:

> "In many cases he will or should know at the time of or soon after the wrongful act that he has been the victim of negligent medical care; in other settings of fact it may be impossible for him, as a layman, unskilled in medicine, reasonably to understand or appreciate that actionable harm has been done him. If this is fairly the fact, we think he should have the statutory time from the moment of discovery, *the moment he knows or should know he has a cause of action, within which to sue.*" (emphasis added).

It supports this assertion upon the authority of *Hahn* and of cases in other jurisdictions which spoke of the rule of discovery in terms of knowledge or reason to believe on the part of the patient that he had "a cause of action" and which held that " . . . limitations fairly and justly should run *from the time of discovery of the right of action* . . . ." In *Mattingly v. Hopkins,* 254 Md. 88, 92-94, the Court referred to the time the plaintiff " . . . discovers the wrong . . ." and quoted *Waldman* as we have above set out. In *Feldman v. Granger,* 255 Md. 288, 293, the Court deemed the statute to have commenced running when " . . . the mistake caused by the appellees' negligence was discovered . . . or with the exercise of reasonable diligence should have been discovered." In *Leonhart v. Atkinson, supra,* at 224, the Court said that the problem to be resolved was " . . . of determining the day that the appellants discovered or should have discovered they had

a cause of action." And in *Watson v. Dorsey*, 265 Md. 509, 512, the Court flatly said, after stating the general rule: "But in Maryland in cases of professional malpractice the cases have established the 'discovery rule' — the rule that the cause of action accrues when the claimant discovers or reasonably should have discovered that he has been wronged." [2]

There is no doubt but that in medical malpractice cases in this jurisdiction, the limitation period starts to run when the patient discovers, or by reasonable diligence should have discovered, the negligent act which caused his injury, or in other words that he may have the basis for an actionable claim, whether or not there is a continuing course of treatment. [3]

There is one more observation necessary. The question when a cause of action accrues is a judicial one; it is for the court to determine, and not the trier of fact. *Waldman v. Rohrbaugh, supra*, at 145, quoting, patently with approval, 1 Wood, *Limitation of Actions*, 685, 686 (4th ed. 1916). [4]

---

**2.** The Court of Appeals has refused to extend the period of limitations beyond the "discovery rule" as construed by it. It has explicitly repudiated the "maturation of harm" rule, *Watson v. Dorsey, supra*, at 512, and has declined to defer the running of the limitation period until the plaintiff had exhausted all available administrative remedies, *Feldman v. Granger, supra*, at 294.

**3.** This means when there are facts known to the patient which would serve as the basis for an actionable claim and not necessarily when the patient is informed by counsel that he has a cause of action.

We note that a patient may be unaware that he has sustained injury until after the statute of limitations has run. In other circumstances, the injury may be readily apparent but the fact of wrong may lay hidden until after the prescribed time has passed. See *Lopez v. Swyer*, 62 N.J. 267, 271, 300 A. 2d 563, 567 (1973).

**4.** *Lopez v. Swyer, supra*, contains a comprehensive discussion of the function of the court in this regard, 300 A. 2d at 566-568:

"The discovery rule is essentially a rule of equity. It has been said that in equity lies its genesis. Owens v. White, 342 F. 2d 817, 820 (9th Cir. 1965). Like so many other equitable doctrines it has appeared and is developing as a means of mitigating the often harsh and unjust results which flow from a rigid and automatic adherence to a strict rule of law. On the face of it, it seems inequitable that an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless. Yet such is the result that must follow if the years of the statute are to be inexorably calculated from the moment of the wrong, whether or not the

## II

The travail of Nellie Maude Jones is best gathered from the telling of it by her when she was deposed and from the various medical records before us. She became a registered nurse in 1940 and practiced nursing continuously since that time, until 1963 at the District of Columbia General Hospital and thereafter at the National Institutes of Health in Bethesda, Maryland. On 8 October 1968, about 11:00 o'clock in the morning, she caught her foot in a strap of an exercise machine in her home and "injured it in some fashion." She

party aggrieved knows or has reason to know that he has a right of redress. . . .

It may also be unjust, however, to compel a person to defend a law suit long after the alleged injury has occurred, when memories have faded, witnesses have died and evidence has been lost. After all, statutes of limitations are statutes of repose and the principal consideration underlying their enactment is one of fairness to the defendant. Developments in the Law-Statutes of Limitations, 63 Harv.L.Rev. 1177, 1185 (1950). So in each case the equitable claims of opposing parties must be identified, evaluated and weighed. Where, as is often the case, they cannot be wholly reconciled, a just accommodation must be reached. We think this can better be done by a judge than by a jury. In the first place the question as to the application of the statute of limitations is ordinarily a legal matter and as such is traditionally within the province of the court. Furthermore, submission of the issue to a jury is in every sense awkward. It is true that the time of discovery is a question of fact, and so could be left to a jury. But, as we have indicated, the matter does not rest there. It is not every belated discovery that will justify an application of the rule lifting the bar of the limitations statute. The interplay of the conflicting interests of the competing parties must be considered. The decision requires more than a simple factual determination; it should be made by a judge and by a judge conscious of the equitable nature of the issue before him.

The determination by the judge should ordinarily be made at a preliminary hearing and out of the presence of the jury. Generally the issue will not be resolved on affidavits or depositions since demeanor may be an important factor where credibility is significant. Where credibility is not involved, affidavits, with or without depositions, may suffice; it is for the trial judge to decide. The issue will be whether or not a party, either plaintiff or counterclaimant, is equitably entitled to the benefit of discovery rule. All relevant facts and circumstances should be considered. The determinative factors may include but need not be limited to: the nature of the alleged injury, the availability of witnesses and written evidence, the length of time that has elapsed since the alleged wrongdoing, whether the delay has been to any extent deliberate or intentional, whether the delay may be said to have peculiarly or unusually prejudiced the defendant. The burden of proof will rest upon the party claiming the indulgence of the rule." (footnotes omitted).

called her sister, also a registered nurse, who made an appointment for her with Dr. S. Jack Sugar, specializing in orthopedic surgery and a Diplomate of the American Board of Orthopedic Surgery. Dr. Sugar saw her at 1:00 p.m. the same day. Her foot was X-rayed by John S. Hashim, M.D., a radiologist, who noted: "AP, lateral and oblique views of the left foot reveal complete fractures of the proximal shafts of the 3rd and 4th metatarsals with the fragments in satisfactory position and alignment. There is some soft tissue swelling over the dorsum of the foot." Dr. Sugar's diagnosis was a "fracture base 3rd & 4th metatarsals and fracture dorsal distal aspect of 1st cuneiform with triangular fragment displaced dorsally." On 10 October she saw Dr. Sugar in the cast room of Prince George's Hospital and he recommended that she be admitted to have her foot set under anesthesia. Dr. Sugar's record under that date reads: "P G In & Out: Still has considerable swelling and emphymosis of left foot, very tender. RX: To be hospitalized at Leland." There were no beds available at the Prince George's Hospital and she was admitted to the Eugene Leland Memorial Hospital about 6:00 p.m. the same day. On 14 October Dr. Sugar performed a closed reduction while she was under a general anesthetic. He applied a "short leg cast." Miss Jones knew that a closed reduction was "that the bone would be set without making an incision in the foot." The cast covered her foot except for her toes and extended up to her knee. She was discharged from the Hospital on 17 October. During her confinement in the Hospital she "noticed that the cast felt tight, and then I noticed that my toes were blue. . . I complained to Dr. Sugar and also complained to the nurses." She knew, as a nurse, "that if there is an impairment of circulation, the temperature of the extremity would change . . . and that the toes, if there was an impairment of circulation, would be colder than the toes of the other foot that was not impaired . . .", but her toes did not feel cold. She saw Dr. Sugar every day she was in the Hospital and she complained of the pain. Just before her discharge she was seen by a physiotherapist and given instructions about using crutches. She next saw Dr. Sugar

on 24 October. In the interim she was experiencing "an awful lot of pain, and especially in my leg, which I hadn't . . . had while I was in the hospital." The pain was in the calf of the leg, under the cast. Dr. Sugar told her to be at Prince George's cast room the next day to have the cast removed. She said that the cast was removed the next day and X-rays were taken. Dr. Sugar's records read that he saw her on 25 October and not 24 October and that she was "To be scheduled at P G In & Out for cast removal and re-x-ray in 11 days." His records further show under date of 4 November: "P G In & Out: Removal of cast. Re-x-ray reported 'Left foot what appears to have been a comminuted fx medial cuneiform and fx thru base either of 3rd and 4th mets. Haziness about fix line attesting to callus formation. General alignment is fairly good.' RX: Elastic bandage. Hot soaks, massage and exercise. Crutches." Dr. Hashim's records show that he X-rayed the foot on 4 November. Miss Jones said that between 25 October and 4 November she telephoned Dr. Sugar and told him she was having a lot of pain and he ordered medication. "Equagesic was ordered for pain."

Miss Jones described the appearance of her lower leg and foot upon removal of the cast: "When the cast was removed my foot looked gangrenous and it was very blue and had reddened areas even around my ankle. And I couldn't move my foot. In fact, my foot just dangled. I had no use of my foot. . . . It looked as though it was inflamed, and the skin looked soft, the tissue looked soft." The foot had a "mottled" appearance. As a nurse, she knew what was meant by "mottled" — "areas of white and blue. . . . It had areas like that."

Dr. Sugar's records show that he saw Miss Jones on 13 November and 4 December 1968. On 13 November there was moderate swelling of her foot. "Bony prominence dorsum of navicular, slightly tender. RX: Continue hot soaks, massage & exercise. Discontinue elastic bandage. Begin weight bearing in show. Return 3 wks." On 4 December he noted that she was still using crutches, that the foot had moderate swelling with marked limitation of motion of the left ankle,

foot and toe. She was to return in two weeks. On 13 December his records indicate that she telephoned complaining that her ankle hurt and she could not sleep. He prescribed Gervine.

Miss Jones commenced her action on 13 December 1971 when she filed her declaration in the Circuit Court for Prince George's County. Therefore, her action would be barred by the statute of limitations if the cause of it accrued before 14 December 1968. Assuming for the purpose of decision that her subsequent injuries were the result of a cast which was negligently applied by Dr. Sugar, the question is whether she discovered, or by reasonable diligence should have discovered, the negligent act before 14 December 1968.[5]

We do not believe that the trial court was wrong in its determination that the cause of action accrued at the time the cast was removed. We first observe that Miss Jones was a registered nurse actively engaged in the practice of her profession for almost 30 years. She was familiar with a closed reduction operation. She knew what effect impairment of circulation in the foot would have; she recognized a "gangrenous" condition; she understood what "mottled" meant medically; she was familiar with and able

---

**5.** The history of Miss Jones's injury, subsequent to 14 December 1968, is not pertinent to the decision here. She continued to experience pain. On 20 December 1968 Dr. Sugar recorded: "Swelling and dusky color, sluggish circulation of left foot and ankle. Appears to be neurovascular condition . . . . Moderately marked limitation of motion of left foot and ankle. May be developing causalgia." A re-x-ray by Dr. Hashim showed "marked osteoporosis." On 10 January 1969 the foot was "thickened with cyanotic appearance and sluggish circulation of skin. Moderate to marked limitation of motion." Dr. Sugar referred Miss Jones to Dr. William A. Holbrook for neuro-vascular reaction. Dr. Holbrook saw her on 15 January. He found that following Dr. Sugar's treatment "for her fractured Metatarsal Bones", she had "persisting vasomotor disturbances, producing coldness and bluish red mottling of her foot with causalgic type pain in her foot. She was unable to walk and was developing a dystrophy, secondary to disuse and vasomotor disturbance." On 24 January he performed a "Left Lumbar Paravertebral Block." On 11 June 1969 he performed a second "Left Lumbar Paravertebral Block." On 22 July he performed a "Left Lumbar Sympathectomy." He last saw her on 1 August. Examination "revealed her to be convalescing well from this surgery. It is estimated, she will return to work, approximately 6-8 weeks following the above date of surgery." She returned to work 22 September 1969. She continued to have trouble walking and received treatment at the Public Health Service Clinic. "I had difficulty walking, I was in pain, my foot continued to swell, and I just couldn't seem to recover from one day to the next, by standing on my feet." She retired on 16 May 1970.

to define "osteoporosis" — "it's softening of the bone"; and "cardiovascular condition" — "a condition of the blood vessels"; and "causalgia" — "causalgia is caused by injury to the nerve, which caused the symptoms which I had." She had attended patients who had casts, and said that when a patient complains that the cast is too tight "you look to see if the skin is against the cast, and you also report it to the doctor so that he can do what's necessary, if anything is necessary." If "you can reach the pulse, why, then you feel the pulse." It is clear from her testimony that she believed that her cast was too tight. "I just felt like it was just squeezing my foot. And I had all this pressure on the bottom of my foot. It was just a terrific pressure." Apparently she had "a feeling of pulsations" in her leg and knew that when patients complained of a too tight cast, attempt should be made to ascertain if there were "any feeling of pulsation with the blood flow." She said she told Dr. Sugar that the cast was too tight "the second day after the cast was put on," and later repeated the complaint to a nurse. After that she complained of the pain. She made a complaint to her sister that the cast was too tight. After she was discharged from the Hospital, her sister examined the cast. "She felt the cast was too tight, you know after I was home, and so — but by that time it was feeling — you know — it wasn't quite so painful then, so I didn't do anything about it, because it wasn't painful then. It wasn't as painful then as it had been, so I wasn't worrying about it myself." Her sister tried to contact Dr. Sugar during the week after her discharge from the Hospital but was unable to reach him.

It being clear that Miss Jones believed shortly after the cast was applied that it was too tight, there is added significance to the constant pain she suffered and to her observation that her toes were blue. But what she saw and experienced when the cast was removed on 4 November 1968, considered with what occurred before, is legally sufficient to establish that at that moment, at the latest, she knew or should have known that she had a cause of action.[6]

---

6. We note that when Miss Jones was asked whether any of the doctors who treated her discussed the cause of the condition that developed following the fracture she said: "In most cases I didn't ask the doctor what caused the condition because I felt that they would rather not tell me."

We repeat her own words which we set out above:

> "When the cast was removed my foot looked gangrenous and it was very blue and had reddened areas even around my ankle. And I couldn't move my foot. In fact, my foot just dangled. I had no use of my foot."

She went on to say that it looked as though it was inflamed, and the skin looked soft, the tissue looked soft. The foot was mottled, which she said meant areas of white and blue.

Appellant contends that "A patient, merely because she is a nurse, should not be held to a higher standard of diligence in discovering malpractice than a layman without first examining her experience, background and medical skills." As the contention is presented, appellant does not claim that a patient's experience, background and medical skills may not be considered in determining whether he knew or should have known he has an injury caused by a negligent act. We think that experience, background and medical skills of a patient may be weighed in such determination. We note that in *Waldman v. Rohrbaugh, supra,* at 145, the Court recognized that it may be impossible for a patient, *"as a layman, unskilled in medicine,* reasonably to understand or appreciate that actionable harm has been done him." (emphasis added). Certainly, the reasonableness of the understanding or appreciation that actionable harm has been done is different as to one skilled and experienced in the medical disciplines than it is as to a layman. We find here, however, as we have above pointed out, that Miss Jones demonstrated through her testimony that she was knowledgeable by education, training and experience in the general medical aspects of her injury. We see no error in the trial court taking this into consideration.

Appellant further contends that the statute of limitations should not apply because she had "the right to rely on the fiduciary relationship and assurances" made by Dr. Sugar while under his care and that she had no need to seek another doctor's advice as to the cause of her continuing discomfort. We have found that she knew or should have

known that she had a cause of action by 4 November 1968. Absent fraudulent concealment, this is enough under the law of Maryland to commence the running of the statute.

We hold that the court below did not err in granting the motions for summary judgment.

*Judgments affirmed; appellant to pay costs.*