503 A.2d 1313

James Francis O'HARA III et al.

v.

Irvin KOVENS et al.

No. 30, Sept. Term, 1985.

Court of Appeals of Maryland.

Feb. 3, 1986.

Paul Mark Sandler (W. Michael Mullen, Zvi Greismann and Freishtat & Sandler, on brief) Baltimore, for appellants and cross appellees.

M. Albert Figinski (Arnold M. Weiner, H. Russell Smouse, Donna C. Sanger and Melnicove, Kaufman, Weiner & Smouse, P.A. and Michael E. Marr and Marr, Bennett & Carmody on brief) Baltimore, for appellees and cross appellants.

Argued before SMITH, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired) and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired) Specially Assigned.

RODOWSKY, Judge.

This is a case of alleged fraud on the sellers of corporate stock. In the trial court the defendants obtained summary judgment against all of the sellers based on a statute of limitations defense. Those judgments were affirmed as to certain sellers by the Court of Special Appeals. *O'Hara v. Kovens*, 60 Md.App. 619, 484 A.2d 275 (1984). We granted cross-petitions for certiorari, 303 Md. 20, 491 A.2d 586, primarily to consider the respective functions of court and jury in determining whether the plaintiffs knew or should have known of the wrong more than three years before suit.

The suit was brought by James Francis O'Hara, III (James) and Michael Patrick O'Hara (Michael), individually and as guardians of the property of their mother, Josephine M. O'Hara (Josephine). Josephine died while the action was pending in the trial court and James and Michael, as her personal representatives, now assert her claim on behalf of her estate. For a number of years prior to December 31, 1971, the O'Haras were stockholders in Southern Maryland Agricultural Fair Association, Inc. (Marlboro) which owned the Marlboro racetrack. The combined holdings of the O'Haras represented approximately 30% of the then outstanding stock of Marlboro. On December 31, 1971, the O'Haras, together with members of two other families whose holdings in Marlboro represented approximately an additional 52% of the outstanding stock, sold and delivered approximately 82% of Marlboro's stock to Ernest N. Cory, Jr. for $12 per share, in cash. The sellers knew that Cory, a Prince George's County, Maryland attorney, was acting in the transaction for an undisclosed principal or principals. Defendants in this suit are former Governor Marvin Man-

del, W. Dale Hess, Harry W. Rodgers, III, William A. Rodgers, Irving T. Schwartz, Eugene B. Casey, Irvin Kovens, and Cory (collectively, the Kovens Group). The complaint, alleging that the Kovens Group engaged in a conspiracy to defraud the plaintiffs in the December 31, 1971 sale, was filed November 22, 1978.[1] Plaintiffs prayed a jury trial. To comply with the statute of limitations, the plaintiffs' respective causes of action could not have accrued earlier than November 21, 1975.

The Circuit Court for Baltimore City held that all three claims were time barred. In the Court of Special Appeals judgment against Josephine's estate was reversed, for reasons relating to mental disability, while the other judgments were affirmed. The facts and legal arguments are such that, if Michael's claim is not barred by limitations, none of the other claims is barred by limitations.

There are certain undisputed, historical facts which set the background for the contentions of the parties. Prior to, or during, the 1971 session of the Maryland General Assembly, Marlboro and an entity (Hagerstown) which also conducted horse racing with parimutuel betting had agreed that Hagerstown would sell to Marlboro eighteen racing days theretofore utilized for the Hagerstown meeting. Those eighteen days, together with eighteen days previously allocated to Marlboro, would allow thirty-six days of racing by Marlboro. Transfer of the Hagerstown days was subject to legislative approval. Approval at either the 1971

---

**1.** The O'Haras contemporaneously brought a separate action under federal securities laws in the United States District Court for the District of Maryland. The federal question claims were dismissed on the basis of a one-year statute of limitations borrowed from the then provisions of the Maryland Securities Act. *See O'Hara v. Kovens,* 625 F.2d 15 (4th Cir.1980), *aff'g* 473 F.Supp. 1161 (D.Md.1979). After the federal court lost jurisdiction of the pendant common law fraud claim, the Kovens Group sought summary judgment in the case now before us.

Plaintiffs' two-count, state-law complaint alleged both common law fraud and a violation of the Maryland Securities Act. The plaintiffs have conceded that their Maryland Securities Act claim is barred by limitations.

or 1972 session of the Maryland General Assembly would have satisfied the approval condition in the contract. H.B. 1128, enacted at the 1971 legislative session, conferred the necessary approval. On May 28, 1971, then Governor Mandel, expressing concerns about the wisdom and constitutionality of the legislation, vetoed H.B. 1128.[2] Following the

---

**2.** Governor Mandel's veto message in relevant part read:

House Bill 1128, however, was amended during its course through the General Assembly, and, as enacted, contains a provision which raises serious questions. The Amendment provides that if the Racing Commission awards the dates of Hagerstown to the joint venture, then for a period of ten years Marlboro shall pay an amount to be reviewed by the Racing Commission but not less than $6,000 per racing date for each racing day transferred. Payment of this sum of money is to be made to the State Comptroller, and from the payments the State Comptroller is directed to pay for a period of ten years, $85,000 per year to Hagerstown if that Association operates a fair in the particular year. The remainder of the monies received by the Comptroller are to be credited to the General Funds of the State Treasury.

Under Article 78B, Section 15(a), the Racing Commission is authorized to issue licenses to various fairs or agricultural exhibitions. Both Hagerstown and Marlboro may be awarded "not to exceed eighteen days."

First, it should be noted that the Racing Commission is not required to award the full number of authorized days to any organization. Each calendar year, specific dates are awarded, and the Racing Commission in any particular year, for any one of numerous reasons, could decide not to award either Hagerstown or Marlboro its maximum of 18 days. See, *Southern Maryland Agricultural Association v. Magruder,* 198 Md. 274, 279, 280 [81 A.2d 592 (1951)].

Consequently, it cannot be predicted what the Racing Commission in each of the next nine years may determine as to the number of days to be awarded to any track owner. Yet House Bill 1128 directs Marlboro to pay to the State Comptroller not less than $6,000 per racing day transferred. It is obvious that the amount to be paid in any year could range from nothing to $108,000 ($6000 × 18 days) or even more, since the bill fixes only the minimum payment. At the same time even though the amount to be paid by Marlboro is uncertain, the Comptroller is directed "from these payments" to pay $85,000 for each of ten years to Hagerstown if it operates a fair. The bill, as amended, is silent as to the procedure to be followed if the payments received by the Comptroller from Marlboro total less than $85,000. However, if these payments exceed $85,000, the bill, as amended, directs that the remainder shall be credited to the General Funds of the State Treasury.

sale by the plaintiffs of their stock in Marlboro the General
Assembly on January 12, 1972, overrode the veto. Also at
the 1972 legislative session a bill which would have in-
creased beyond thirty-six the number of racing days allocat-
ed for the benefit of Marlboro died on the last day of the
session. In December 1972 Marlboro merged with another
corporation (Bowie) which conducted horse racing with pari-
mutuel betting at the Bowie racetrack. On November 24,
1975, the federal government filed indictments against Gov-
ernor Mandel and others, except Schwartz and Casey, of the
Kovens Group. The events and transactions described
above ultimately were the subject of testimony at criminal
trials.[3] From at least the time of the veto override on

---

The problems raised by the payment provision of House Bill 1128
can be illustrated by the following hypothetical. If, for example, in
its discretion the Racing Commission in any year determined to
award not 18 days but only 7 days, the minimum payment to the
Comptroller would produce only $42,000. Yet he is directed to pay
Hagerstown $85,000, "from the payments". If he pays over only the
$42,000, what is to be done about the deficit of $43,000? Is it the
intent of the bill as amended that Hagerstown is bound by the joint
venture, even if it does not receive the full $85,000? This could lead
to litigation between Hagerstown and Marlboro which is not in the
best interest of either these associations or the State of Maryland.
Or is it the intent of the bill, as amended, that if the payments are
less than $85,000, the difference is to be made up from the surplus
of payments in prior years or from the General Treasury? In either
event this would be unconstitutional. The Amendment clearly
directs that the excess over $85,000 in each year is to be credited to
the General Funds of the State Treasury. So whether that excess or
other treasury funds are to be used is not decisive. Under Article
III, Section 52, of the Maryland Constitution, the Legislature cannot
appropriate any money out of the Treasury except by a Budget Bill
or a Supplementary Appropriation Bill. Obviously, this bill is
neither. See Baltimore v. O'Conor, 147 Md. 639 [128 A. 759 (1925)].
If the bill, as amended, is an attempt to appropriate money from the
State Treasury for any part of the payments to Hagerstown, it
contravenes the provisions of Article III and is unconstitutional.
   In light of the serious questions raised by House Bill 1128, I
believe that the measure must be vetoed. [1971 Maryland Laws, at
1929–30.]

3. Convictions ultimately obtained on these indictments were the sub-
ject of the opinions in United States v. Mandel, 602 F.2d 653 (4th Cir.)
(en banc), modifying and rev'g 591 F.2d 1347 (4th Cir.1979).

January 12, 1972, through the key limitations date here of November 21, 1975, these events and transactions were also objects of great interest, and subjects of much reporting, on the part of the press.

The theory of the O'Haras' case is that there was a conspiracy between Governor Mandel and others of the Kovens Group which antedated May 28, 1971. Plaintiffs in essence contend that the alleged conspirators planned (1) to have the Mandel veto depress the value of Marlboro stock below the price it would have commanded had H.B. 1128 been signed into law, (2) to acquire the stock at a depressed price, and then (3) to restore its value by having Governor Mandel "himself and through his agents" induce the General Assembly to override the veto.

Because defendants' motion for summary judgment raised only the limitations defense, we are not concerned with the sufficiency of any undisputed facts to prove any element of plaintiffs' deceit theory, or whether any alleged facts, if proved, would establish a cause of action. The burden which the defendants assumed by their motion was to show that there was no dispute of any fact material to the limitations issue and that they were entitled to judgment on limitations grounds as a matter of law. Maryland Rule 2–501.

### general law re limitations

The three years within which a civil action at law must be filed measures "from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md.Code (1974, 1984 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article (Courts Article). *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677, 680 (1981) held that "the discovery rule [is] applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." This latter alternative

contemplates ... awareness implied from

"knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." [*Id.* at 637, 431 A.2d at 681.]

■ Also relevant is Courts Article § 5–203 which provides:

If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

In order to benefit from this statute, a claimant need not show, in addition to the fraud complained of, a separate fraud which conceals the fraud complained of. *Wear v. Skinner*, 46 Md. 257, 267 (1877); *see also Brack v. Evans*, 230 Md. 548, 187 A.2d 880 (1963); *Citizens National Bank v. Leffler*, 228 Md. 262, 179 A.2d 686 (1962); *Piper v. Jenkins*, 207 Md. 308, 113 A.2d 919 (1955); *Berman v. Leckner*, 188 Md. 321, 52 A.2d 464 (1947); *New England Mutual Life Insurance Co. v. Swain*, 100 Md. 558, 60 A. 469 (1905).

In *James v. Weisheit*, 279 Md. 41, 367 A.2d 482 (1977), we dealt with a defense of limitations to a common law fraud action prior to the general adoption of the discovery rule in *Poffenberger, supra.* There we said:

This Court has determined that deceit actions accrue when the wrong is discovered or when with due diligence it should have been discovered, *see Citizens Bank v. Leffler*, 228 Md. 262, 269, 179 A.2d 686, 690 (1962); *Sears v. Barker*, 155 Md. 323, 330, 141 A. 908, 911 (1928); *cf. Leonhart v. Atkinson*, 265 Md. 219, 224, 289 A.2d 1, 4 (1972) (applying this rule to professional malpractice cases), assuming, of course, that all elements of the cause

of action exist at that time. [279 Md. at 45 n. 4, 367 A.2d at 485 n. 4.]

*James* and Courts Article § 5–203 literally speak of accrual occurring when the wrong should have been discovered. This phraseology raises the question whether the period required for any investigation which should have been prompted by notice and which would have led to the discovery of the fraud precedes the date of accrual and is to be excluded from the three-year period of limitations. The facts in our prior cases have not involved a relatively extended period of discovery so that we have not focused on this aspect of the discovery rule. For example, in *James*, the plaintiff knew for more than three years before suit all of the facts comprising the alleged fraud. Specifically, that plaintiff, the holder of a take-back, second mortgage, knew that the amount of the allegedly fraudulently imposed first mortgage lien greatly exceeded the amount to which the plaintiff had agreed to subordinate. We held that accrual of the deceit action was not postponed until the plaintiff learned whether foreclosure of the first mortgage produced a deficiency on the second mortgage debt.

The Court of Special Appeals, however, has addressed the problem in a medical malpractice case which correctly applies *Poffenberger. Lutheran Hospital v. Levy*, 60 Md. App. 227, 482 A.2d 23 (1984). The limitations issue in that case was the subject of a separate trial under former Maryland Rule 501. Following treatment for a broken ankle the plaintiff had been advised in February 1974 to resume walking without crutches. In April 1974 a doctor at another hospital who examined the ankle told the plaintiff that it "was all messed up," asked "who the hell told you to walk on that ankle?" and told her the ankle "wouldn't get any better." Suit was filed in June 1978. The trial court held the action was timely, after determining that the plaintiff was not on notice until early 1975 after which there was a reasonable period for investigation of six months before accrual. The Court of Special Appeals held the

action was barred as a matter of law, based upon the plaintiff's uncontradicted testimony.

Addressing the trial court's rationale, the intermediate appellate court, through Judge Adkins, said:

> The trial judge also held that limitations did not begin to run until six months after the date upon which he erroneously found that Ms. Levy had become "suspicious." This was incorrect as a matter of law. Under the discovery rule as stated in *Poffenberger* limitations begin to run when a claimant gains knowledge sufficient to put her on inquiry. As of that date, she is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation. . . .
>
> From that date the statute itself allows sufficient time—three years—for reasonably diligent inquiry and for making a decision as to whether to file suit. *See Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 668, 464 A.2d 1020 (1983). This application of the discovery rule serves the legislative policy that underlies the statute of limitations, *id.* at 665, 464 A.2d 1020, and at the same time puts the discovery rule claimant on a par with the claimant who has actual knowledge at the time of the tort such as the normal automobile-accident plaintiff. The latter has three years from the date of the accident within which to investigate further, obtain expert opinion, discuss settlement, and file suit. The former is given the same time period within which to do these things, beginning from the date that circumstances have put her to that inquiry which charges her with knowledge of the additional information that might be gleaned from a reasonably diligent investigation conducted within the three-year period. [60 Md.App. at 237–38, 482 A.2d at 27–28.]

*defendants' contentions*

Applying the foregoing principles to this case, the defendants contend that the plaintiffs knew, as a matter of law, on or before November 21, 1975, of facts from which they should have discovered the alleged fraud. To prove knowledge of the fraud was available to the diligent, the defendants have produced newspaper articles reporting on the actual or ostensible ownership of Marlboro, on racing consolidation proposals, and on a federal investigation of various persons in the Kovens Group. The potentially relevant articles are those published prior to November 22, 1975.

One example is an article appearing in the Baltimore Sun of April 3, 1972. It lead by reporting that "Irving T. Schwartz, a close friend and financial associate of Irvin Kovens—Governor Mandel's chief fund raiser—owns a minority interest in Marlboro racetrack." The article reported that the preceding day Kovens had sent telegrams to all sixteen members of the Senate Finance Committee "in which he denied that he [had] any connection, 'directly or indirectly,' with Marlboro." Schwartz was quoted as saying " 'Kovens has nothing to do with Marlboro as far as I know.' " The article also described Eugene B. Casey as having "bought controlling interest in Marlboro—reportedly more than 80 per cent of the stock—December 31, 1971, for $2.4 million." The article described as "a surprising turn of events" that "Governor Mandel's aides, while pressuring legislators not to override the Governor's vetoes of other bills, did not try to block the successful overturn of his Marlboro veto—requested by Mr. Casey in letters to legislators."

When pressed to select a date by which the plaintiffs' action necessarily had accrued, the defendants selected October 23, 1975, because of an article appearing that day in the Baltimore Sun.[4] We quote liberally therefrom.

---

4. There is no direct evidence that any plaintiff read the October 23, 1978, article. The closest evidence is an admission by Michael on

During the 1972 session of the Legislature, a minor, half-mile track in Prince George's County suddenly emerged as the dominant force in the politically controlled racing industry in Maryland.

While Laurel, Pimlico and Bowie, the three major, mile tracks, had all competed to be the favored facility in past years, their interests became secondary to the advancement of Marlboro race course as the thrust of regulatory and legislative actions became clear.

A series of Mandel administration, racing commission and legislative moves had the effect first of apparently giving Marlboro stockholders a windfall (through a bill granting additional racing dates) and then taking the windfall back (through a Mandel veto of the racing date bill).

Then, close friends of Governor Mandel secretly bought into the track at an apparent cut rate, the Legislature uncharacteristically overrode an unprotesting Governor's veto and two bills—which would further increase the track's profits—were put before the Legislature by the Racing Commission and heavily lobbied by Mandel aides.

Those bills died as the 1972 Legislature adjourned and it is unclear what profits, if any, the new ownership eventually reaped from the series of actions.

Marlboro and its stockholders are now a focal point in the federal grand jury investigation into corruption in Maryland, and the grand jury has subpoenaed the testimony of the 42 surviving members of the 1972 state Senate.

---

deposition that an article in The Evening Sun of October 25, 1975, was "familiar." That article reported that certain members of the Maryland Senate had appeared before the federal grand jury in "the continuing political corruption investigation." It referred to the veto override "shortly after two associates of the Governor had purchased a secret interest" in Marlboro. It said the "Governor held the legislature in a virtual iron grip" and that "[t]he overriding of a veto was almost unheard of."

That same article commented that the "value of the track had apparently been depressed by the veto of the Hagerstown-to-Marlboro transfer." It reviewed how Casey had "publicly portrayed himself as the majority stockholder" in Marlboro after the December 1971 sale but that "large blocks of stock were acquired by two close associates of Governor Mandel," Hess and Harry Rodgers who, together with the Governor, had been "notified that they [were] targets of the federal corruption inquiry." The article reported that Harry Rodgers had borrowed $200,000 from Kovens "to acquire his secret interest in the track" and that the interests of Hess and Rodgers had become known to the press and reported by it in February and March of 1975. A statement attributed to William Rodgers explained that the interests of Hess and of the Rodgers brothers were kept secret to avoid a controversy which would have caused defeat of the legislation increasing the number of racing days allocated to Marlboro.

### *plaintiffs' contentions*

Plaintiffs do not challenge that the legal test is when they were on notice, but they place that date much later than November 21, 1975. Answering an interrogatory asking when he discovered the fraud alleged in the complaint, Michael said that he did so after Schwartz had testified in the first trial of the criminal case involving Governor Mandel.[5] On deposition Michael explained this answer more fully. A trier of fact could have concluded, from the total record before us, that the sequence of events leading to this suit was as follows.

As between Michael and James, Michael was better informed on current events taking place in Maryland in the period prior to November 22, 1975, even though Michael had resided in Georgia from June of 1973 to June of 1975 and had visited only occasionally in Maryland during that peri-

---

5. The Schwartz testimony in *United States v. Mandel* is not part of the record before us.

od. Michael is the prime mover in the decision to consult counsel concerning the three persons' claims asserted in this law suit. Josephine, due to senility, had needed a guardian to manage her affairs from as early as February 25, 1975.

When the O'Haras sold their Marlboro stock in December 1971, they thought the price was fair. They at least suspected that the undisclosed principals represented by Cory were persons with some political "clout" who would attempt to have the General Assembly override the veto. Because the O'Haras were out of the Marlboro stock at a price which was satisfactory to them, Michael could not have cared less who the specific purchasers were. Similarly, he did not believe that it was his concern if friends of Governor Mandel purchased Marlboro stock or had benefited from the veto override.

We shall assume for purposes of this opinion that Michael also knew prior to November 21, 1975, that Schwartz on June 1, 1971, had purchased in his name 15,000 shares of Marlboro stock at $7 per share from the estate of a decedent, Florence Hall.

At some time after the criminal trial had started Michael learned of testimony relating to the initials "I.K." on checkstubs from the checkbook of Schwartz. The entry indicated that the cash with which Schwartz had purchased Marlboro stock on June 1, 1971, had been obtained, ostensibly as a loan, from Kovens. Michael inferred foreknowledge by Kovens of the May 28, 1971, veto and that he might have been legally wronged by a conspiracy.

### lower courts' rationales

Before we address the rationales of the courts below, it will be helpful to review the distinction made in common law legal systems between issues of fact and issues of law. 5 R. Pound, *Jurisprudence* 544 (1959) presents, as the best judicial discussion of the subject, excerpts from the opinion of Lord Denning in *British Launderers' Association v.*

*Borough of Hendon Rating Authority,* [1949] 1 K.B. 470, 471–72:

> "Primary facts are facts which are observed by witnesses and proved by oral testimony or facts proved by the production of a thing itself, such as original documents. Their determination is essentially a question of fact for the tribunal of fact, and the only question of law that can arise on them is whether there was any evidence to support the finding. The conclusions from primary facts are, however, inferences deduced by a process of reasoning from them. If, and in so far as, those conclusions can as well be drawn by a layman (properly instructed on the law) as by a lawyer, they are conclusions of fact for the tribunal of fact; and the only questions of law which can arise on them are whether there was a proper direction in point of law; and whether the conclusion is one which could reasonably be drawn from the primary facts.... If, and in so far, however, as the correct conclusion to be drawn from primary facts requires, for its correctness, determination by a trained lawyer—as, for instance, because it involves the interpretation of documents or because the law and the facts cannot be separated, or because the law on the point cannot properly be understood or applied except by a trained lawyer—the conclusion is a conclusion of law on which an appellate tribunal is as competent to form an opinion as the tribunal of first instance." [5 R. Pound, *supra,* at 549–50 (footnote omitted).]

We shall assume, without deciding, that there is no dispute of material, primary fact in the instant case. From the primary facts some tribunal must deduce when the plaintiffs were on notice. That ultimate fact is ordinarily a question for the trier of facts going to the merits. " '[W]hether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the

jury.' " *New England Mutual Life Insurance Co. v. Swain*, 100 Md. 558, 574, 60 A. 469, 472 (1905) (quoting *Faust v. Hosford*, 119 Iowa 97, 100, 93 N.W. 58, 59 (1903)); *see also Herring v. Offutt*, 266 Md. 593, 599, 295 A.2d 876, 880 (1972); *Cummings v. Bannon*, 8 A. 357 (Md.1887); *cf. Palmer Ford, Inc. v. Wood*, 298 Md. 484, 471 A.2d 297 (1984) (whether the facts, as found by the trier of fact, in a malicious prosecution action show the absence or presence of probable cause is a question for the court).

■ Both the trial court and the Court of Special Appeals correctly recognized that the question of when the plaintiffs were on notice was a question of fact. Nevertheless, the trial court concluded, erroneously, that this question of fact could be decided by the court. The Court of Special Appeals accepted that premise so that it reviewed the circuit court summary judgment under the inapplicable standard of whether the trial judge's "fact-findings" were clearly erroneous. The circuit court, making a credibility determination, rejected, as "arbitrary and contrived," Michael's account of how discovery had come about. The trial judge said that there were substantial "limitations-related facts on which this court can base a determination that plaintiffs' cause is barred by limitations." She then found that "on the basis of inference which reasonable persons would have drawn from the news reports," the plaintiffs, James and Michael, "at least have been put on notice to investigate the alleged wrongs more than three years before their suit was filed." The Court of Special Appeals affirmed as to Michael and James on the ground that "limitations is still a matter for the judge rather than the jury even if the facts concerning discovery are disputed." *O'Hara v. Kovens*, 60 Md. App. at 629, 484 A.2d at 280. These holdings cannot be reconciled with fundamental summary judgment law. In reaching their results both courts relied upon *Moy v. Bell*, 46 Md.App. 364, 416 A.2d 289, *cert. denied*, 288 Md. 740 (1980) and *Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389 (1980), *cert. denied*, 289 Md. 735 (1981).

*Moy* was an appeal from a judgment for the defendants entered on a motion to dismiss granted under former Maryland Rule 535 at the end of the plaintiffs' case. The judgment was premised on limitations as to which there were conflicting, material, factual inferences. The *Moy* court affirmed, saying:

> If there is a legal question raised, which would end it if factually found to apply in the plaintiff's own case, the judge, while still in his judicial capacity, is charged with deciding the appropriate facts necessary to deciding that legal issue. Here, when the motion to dismiss was offered raising the statute of limitations as a bar, the trial judge sat in both seats simultaneously. Our review on appeal then must carefully differentiate the purposes for which the facts were found. Because the ultimate issue to be decided on the motion was the applicability of the statute of limitations, we may not set aside the facts found by the trial judge in relation thereto unless he was clearly in error. Md.Rule 1086. [46 Md.App. at 368–69, 416 A.2d at 293.]

■ We would serve no useful purpose in analyzing whether *Moy* correctly stated how former Md.R. 535 operated, because the power of the trial court to make factual determinations in ruling on a motion for judgment at the close of a plaintiff's case in a bench trial is now governed by Rule 2–519(b) which is in part new.[6] *Moy*, however, went on to say that "[t]he application of a statute of limitations is strictly a legal question and it is apparent that the facts necessary to determine its application, such as

---

6. Maryland Rule 2–519, motion for judgment, provides in subsection (b) as follows:

> When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion was made.

when a cause of action accrues, if a cause of action accrues, etc., must be made by the judge in his judicial role." 46 Md.App. at 370, 416 A.2d at 293–94 (footnote omitted). This oversimplification is wrong. The same oversimplification led the Court of Special Appeals in *Decker v. Fink, supra,* to review a judgment based upon limitations which had been rendered on a directed verdict granted at the close of the plaintiff's case by applying a clearly erroneous standard to fact-findings made by the trial judge rather than by resolving all conflicts in the evidence in favor of the plaintiff.

The notion that all aspects of a limitations defense, including the resolution of conflicting facts and inferences, is a function of the court alone can be traced to misinterpretation in certain opinions by the Court of Special Appeals of decisions by this Court concerning the discovery rule in the era prior to *Poffenberger,* 290 Md. 631, 431 A.2d 677. *Moy v. Bell,* 46 Md.App. at 370, 416 A.2d at 293–94, supported the position that only judges are involved in ruling on limitations by citation to *Harig v. Johns-Manville Products Corp.,* 284 Md. 70, 74–75, 394 A.2d 299, 302 (1978) and to *Waldman v. Rohrbaugh,* 241 Md. 137, 145, 215 A.2d 825, 830 (1966). *Decker v. Fink,* 47 Md.App. at 210–11, 422 A.2d at 393–94, supported the proposition by citation to *Moy v. Bell* and to *Jones v. Sugar,* 18 Md.App. 99, 305 A.2d 219 (1973). *Jones v. Sugar* was a medical malpractice case in which the trial court had granted motions for summary judgment in favor of the defendants based on limitations. The court concluded its discussion of limitations in professional malpractice actions by saying:

> The question when a cause of action accrues is a judicial one; it is for the court to determine, and not the trier of fact. *Waldman v. Rohrbaugh, supra,* [241 Md.] at 145 [215 A.2d 825] quoting, patently with approval, 1 Wood, *Limitation of Actions,* 685, 686 (4th ed. 1916). [18 Md.App. at 105, 305 A.2d at 223 (footnote omitted).]

In a footnote to the above-quoted passage the court presents a long quotation from *Lopez v. Swyer,* 62 N.J. 267, 300 A.2d 563 (1973) which clarifies that the court's intent in

*Jones* is to place fact issues, including credibility, in the domain of the court.

*Waldman v. Rohrbaugh, supra,* also involved a limitations defense to a medical malpractice claim. The citations to *Waldman* in *Moy* and in *Jones* focus on the following sentence which formed part of *Waldman's* discussion of a New Jersey decision, *Fernandi v. Strully,* 35 N.J. 434, 173 A.2d 277 (1961):

> The [New Jersey] Court then quoted 1 Wood *Limitation of Actions,* 685, 686 (4th ed. 1916) that "the question when a cause of action accrues is a judicial one, and to determine it in any particular case is to establish a general rule of law for a class of cases, which rule must be founded on reason and justice," and held that in foreign object or substance cases limitations fairly and justly should run from the time of discovery of the right of action, its previous decision to the contrary notwithstanding. [241 Md. at 145, 215 A.2d at 830.]

Prior to the general adoption of the discovery rule in *Poffenberger,* this Court had said that the word "accrues" in Courts Article § 5–101 generally referred to the time when the alleged wrong occurred. The discovery rule was an exception which had been applied to certain kinds of actions beginning with medical malpractice in *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917) and thereafter to other specific types of wrongs as cases arose. *See Trimper v. Porter-Hayden,* 305 Md. 31, 40 nn. 2–9, 501 A.2d 446, 451 nn. 2–9 (1985); *Poffenberger,* 290 Md. at 634–36, 431 A.2d at 679–80. Prior to *Poffenberger,* whether the discovery or the occurrence of the wrong test was to be applied was for the court to determine just as, following *Poffenberger,* how the discovery rule operates in different types of cases is for the court to determine. *See Trimper v. Porter-Hayden, supra* (latent disease actions accrue at the earlier of discovery or death). It was that judicial function of establishing the rule governing accrual in various types of cases to which *Waldman* referred. *Harig v. Johns-Manville Products Corp.,* 284 Md. at 75, 394 A.2d at 302, did not enlarge

the judicial function when it said that "[a]bsent such statutory definition, the question of when a cause of action accrues is left to judicial determination."[7] These statements do not mean that fact-finding on limitations issues is always for the court.

This Court's *Poffenberger* refutes that concept. There a homeowner sued the builder upon discovering that the house violated a setback requirement. The trial court applied a discovery rule but granted summary judgment for the defendant because it found that the plaintiff had not been diligent. The Court of Special Appeals disagreed on that phase of the case but affirmed on the ground that constructive notice based on land records had started the statute running. *Poffenberger v. Risser,* 46 Md.App. 600, 421 A.2d 90 (1980).[8] This Court, applying a discovery rule,

---

**7.** In support of this statement *Harig* cited *Raymond v. Eli Lilly & Co.,* 117 N.H. 164, 167, 371 A.2d 170, 172 (1977); *Berry v. Branner,* 245 Or. 307, 313, 421 P.2d 996, 999 (1966); and *Jones v. Sugar, supra,* 18 Md.App. 99, 105, 305 A.2d 219, 223 (1973). In *Raymond,* at the cited page, the New Hampshire court noted that that state's statute of limitations did not define "accrued" but left the time of accrual to judicial determination. The New Hampshire Supreme Court had, prior to *Raymond,* decided that the discovery rule applied in cases of medical malpractice. In *Raymond* the court, answering a certified question from a federal court, held that the discovery rule also applied in medical drug, products liability cases. In *Berry* the Supreme Court of Oregon adopted the discovery rule for medical malpractice cases, thereby overruling a prior, contrary holding. At the cited page the court noted that the Oregon legislature had left undetermined the time of accrual which could be judicially determined to occur either when the physician performed the negligent act or when it was discovered by the patient. Consequently *Harig's* citation of *Jones v. Sugar* should not be read as an approval of the footnote in *Jones v. Sugar* which views factual issues relevant to the application of the statute of limitations as issues for the court.

**8.** The analysis of the Court of Special Appeals in its *Poffenberger* of the law-fact functions when a limitations defense has been raised is entirely consistent with the reasoning of our opinion in this case. There the intermediate appellate court said that the trial court had overlooked the fact that plaintiff had alleged factual circumstances which, if proved and believed, may have made the applicability of [the "prudent plaintiff" and "due diligence"] tests susceptible to different factual interpretations. The standard to be applied for

held that land record notice did not trigger the statute and reversed the Court of Special Appeals. We directed remand to the circuit court for further proceedings because of a factual dispute which had to be resolved.

[T]he record seems to establish no contest as to the fact that the respondent lacked express knowledge with respect to the side lot line infringement until the time the adjoining lot was surveyed. However, there is reflected a factual dispute regarding whether, sometime prior to that survey, the petitioner possessed knowledge from which actual notice may be inferred. Consequently, the granting of summary judgment was error and its entry must be reversed. [290 Md. at 638, 431 A.2d at 681.]

If the position taken by the Court of Special Appeals in the case now before us were correct, then this Court need not have remanded to the circuit court in *Poffenberger*. If resolving conflicting facts is the function of the trial judge on a summary judgment motion raising a limitations defense, then the trial judge in *Poffenberger* had already performed that function. *See James v. Weisheit*, 279 Md. at 46, 367 A.2d at 486 ("[W]hether a cause of action is barred by the statute of limitations is ordinarily a mixed question of law and fact that may be taken from the jury only when the court determines as a matter of law that the suit was not instituted within the proper time."); *Merchants Mortgage Co. v. Lubow*, 275 Md. 208, 339 A.2d 664 (1975) (grant of summary judgment for defendant on limitations grounds reversed and case remanded; reasonable diligence affected by fiduciary relationship).

---

when a cause of action accrues is properly a judicial determination, *Harig, supra* [, 284 Md.] at 75 [394 A.2d 299]. But the factual nuances of the case, susceptible to varying interpretations to which that standard must be applied, are questions for a jury, subject to instructions of the court as to what in law is sufficient to constitute a bar or to take the case out of the statute.... That which constitutes diligence and prudence is, like beauty, a judgment made through the eyes of the beholder, not to be summarily determined by judges as a matter of law. [46 Md.App. at 604–05, 421 A.2d at 92–93 (footnote omitted; citation omitted).]

■ Numerous other decisions in this Court demonstrate that questions of fact on which a limitations defense will turn are to be decided by the jury or, when sitting as a jury, by the court. These issues of fact include: when a notice of assessment on an insurance policy was sent, where that date determined accrual, *Lichtenberg v. Joyce*, 183 Md. 689, 39 A.2d 789 (1944); when services were rendered, where that date determined accrual, *Wash., Balto. & Annap. Elec. R.R. Co. v. Moss*, 130 Md. 198, 100 A. 86 (1917); whether and/or when a new promise had been made which would have the effect of removing the bar of limitations, *Brown v. Hebb*, 167 Md. 535, 175 A. 602 (1934), *Gill v. Donovan*, 96 Md. 518, 54 A. 117 (1903), *Shipley v. Shilling*, 66 Md. 558, 8 A. 355 (1887), *Newman v. McComas*, 43 Md. 70 (1875), *Guy v. Tams*, 6 Gill 82 (1847), and *Oliver v. Gray*, 1 H. & G. 204 (1827); whether a part payment on account had been made so as to remove the bar of limitations, *Quynn v. Carroll*, 10 Md. 197 (1856); and whether the plaintiff's action for malicious interference with a contractual relationship had been concealed by fraud, *Cumberland Glass Mfg. Co. v. DeWitt*, 120 Md. 381, 87 A. 927 (1913).

### decision

■ It does not necessarily follow from any of the foregoing that the result reached by either of the courts below was incorrect. Indeed, the principal argument urged by the Kovens Group is that the plaintiffs were on notice of the alleged fraud as a matter of law. This argument uses "matter of law" in the sense that reasonable men, on this record and properly instructed as to the applicable law, could not fail to find that the plaintiffs were on notice more than three years before this suit was brought. To decide this question one must know what being on notice means, or could mean, in this case. Notice is not limited to actual knowledge of the fraud. Nor does it mean discovery of proof which, if believed, would, in the opinion of counsel, take the case to the jury on the merits. It is not limited to admissible evidence.

We have seen, as discussed above, how being "on notice" means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud. Further, because the notice must relate to the fraud alleged, notice in this case must relate to the plaintiffs' claim that a conspiracy within the Kovens Group antedated the veto. Critical to the claim is the state of mind of Governor Mandel prior to May 28, 1971. The theory is that the veto message, *see supra* note 2, misrepresented the true reasons for the veto, which had been cast to depress Marlboro stock, not simply incidentally, but for the purpose of benefiting co-conspirators as future stock purchasers.

■ To test the defendants' argument that the only fact-finding which reasonable persons could make is a finding that the plaintiffs were on notice of the alleged fraud, we must place ourselves back in time to on or before November 21, 1975. That is before any indictments were returned. The general background on this record as of that time is consistent with a variety of hypotheses as to the timing of, and scope of the purpose of, a conspiracy, if any, among some or all of the persons in the Kovens Group. These hypotheses include:

1. A conspiracy antedated the veto.

2. There was an innocent acquisition of foreknowledge of the veto by persons in the Kovens Group without any conspiracy having then been formed.

3. Purchase in June 1971 by one or more of the persons in the Kovens Group of Marlboro stock was without any foreknowledge of the veto.

4. A conspiracy was formed after June 1971 but prior to the stock purchase of December 1971.

5. A conspiracy was formed after the stock purchase of December 1971 but prior to the veto override.

6. A conspiracy was formed after the veto override for the purpose of obtaining enactment of racing consolidation legislation.

7. There was no conspiracy at any time.

The hypothesis first stated is the only one which, if proved, might be an actionable fraud leading to damages recoverable by the plaintiffs. The first hypothesis is the only one involving a conspiracy which could have included as a purpose the injury of Marlboro shareholders, as such, by the veto.

Ultimately, when the federal indictments were returned, a theory of the mail fraud counts was that there had been a scheme and artifice "[t]o defraud the citizens of the State of Maryland ... of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performances of official duties by MARVIN MANDEL, in his official capacities as Governor of the State of Maryland." *United States v. Mandel,* 415 F.Supp. 997, 1003 (D.Md.1976). Even if we were to assume that the mass of media attention to the Mandel investigation would put reasonable persons on notice as a matter of law that there may have been a fraud in the sense of the mail fraud indictment, it would still be necessary to infer from that notice that the plaintiffs were also on notice of a conspiracy to depress Marlboro stock which antedated the veto. That latter inference cannot be drawn as a matter of law on this record because of a multitude of conflicting inferences. We shall review only the principal ones.

The record, including specifically the deposition of Michael, does not pin down beyond dispute even Michael's knowledge of the content of the newspaper articles produced as exhibits by the defendants. It is debatable how much knowledge a fact finder would infer that a reasonably prudent and diligent former stockholder in Marlboro, on and prior to November 21, 1975, would have had based on what had been publicly reported.

Notice of the fraud alleged here would require, *inter alia*, awareness of a possibility, to a degree warranting further investigation, that the veto message was designed to cover the real motive for the veto. The veto message rests on facts which, facially, are accurate and on a legal analysis which appears to be well-reasoned. It is at least debatable whether reasonable persons by November 21, 1975, should have considered that the message might have been merely a sham.

Under Maryland Constitution, art. II, § 17 override of a veto requires the votes of three-fifths of the members elected to each House of the General Assembly. Implicit in the alleged fraud is some degree of confidence on the part of the Kovens Group in the spring of 1971 that the 1972 General Assembly would override the veto. This required the votes of twenty-six senators and of eighty-six members of the House of Delegates.[9] A fact finder would not be compelled to conclude that a reasonably prudent former Marlboro shareholder would, by no later than November 21, 1975, have to have been aware of the possibility, to a degree warranting further investigation, that the Governor of Maryland not only possessed such control over both Houses of the General Assembly but also that the Governor may have planned to use that control in furtherance of a conspiracy to injure Marlboro stockholders.

Under the ordinary principles governing summary judgment, which continue to apply when the issue on summary judgment is limitations, the defendants' motion fails. *See generally Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663 (1984); *Keesling v. State*, 288 Md. 579, 420 A.2d 261 (1980); *Millison v. Clarke*, 287 Md. 420, 413 A.2d 198 (1980); *Walde v. Capital Mortgage Investments*, 286 Md. 343, 407 A.2d 1143 (1979); *Honaker v. W.C. & A.N. Miller Dev. Co.*, 285 Md. 216, 401 A.2d 1013 (1979). Consequently, the judgments of the Court of Special Appeals

---

**9.** These numbers presuppose that a product including a fractional vote is rounded up to the next full vote.

affirming summary judgment for the defendants against Michael and James will be reversed and the judgment of the Court of Special Appeals reversing summary judgment for the defendants against Josephine's estate will be affirmed.

JUDGMENTS OF THE COURT OF SPECIAL APPEALS FOR THE RESPONDENTS, IRVIN KOVENS ET AL., AND AGAINST THE PETITIONERS, MICHAEL O'HARA AND JAMES FRANCIS O'HARA, INDIVIDUALLY, REVERSED. JUDGMENT OF THE COURT OF SPECIAL APPEALS FOR THE CROSS–RESPONDENTS, MICHAEL O'HARA AND JAMES FRANCIS O'HARA, AS PERSONAL REPRESENTATIVES OF THE ESTATE OF JOSEPHINE O'HARA, AND AGAINST THE CROSS–PETITIONERS, IRVIN KOVENS ET AL., AFFIRMED.

CASES REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE RESPONDENTS AND CROSS–PETITIONERS, IRVIN KOVENS ET AL.