**Jane DOE, Plaintiff,**

v.

**AMERICAN NATIONAL RED CROSS
t/a Central Red Cross, Defendant.**

**Civil No. AMD 94–3032.**

United States District Court,
D. Maryland.

April 25, 1996.

Christopher Kennedy, Schochor, Federico & Staton, Baltimore, MD, for plaintiff.

Mark D. Gately, Miles & Stockbridge, Baltimore, MD, Robert Conley, Arnold & Porter, Washington, DC, for defendant.

## MEMORANDUM OPINION

DAVIS, District Judge.

The plaintiff in this case, Jane Doe, a pseudonym ("Doe"), is infected with the human immunodeficiency virus ("HIV"). She seeks damages against the defendant, American National Red Cross t/a Central Red Cross ("Red Cross"), for its alleged negligence in connection with blood transfusions she received in January 1985. This Court has jurisdiction pursuant to 36 U.S.C. § 2. *See American Nat'l Red Cross v. S.G.*, 505 U.S. 247, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992). Pending before the Court is Red Cross's motion for summary judgment. No hearing is necessary. Local Rule 105.6 (D.Md.1995). Red Cross contends that Doe's claims are barred by Maryland's three-year statute of limitations, Md.Code Ann., Cts. & Jud.Proc. § 5–101 (1974, 1995 Repl.Vol.). For the reasons set forth herein, I agree with Red Cross that the action was not timely instituted.

(i)

■ Summary judgment is appropriate where the material facts are not in dispute and all that remains is a question of law for the court. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). Also, it is the law in Maryland that the question of when a cause of action accrues is an issue of law for the court.[1] *Pennwalt Corp. v. Nasios*, 314 Md. 433, 437, 550 A.2d 1155, 1157 (1988); *Harig v. Johns–Manville Prod. Corp.*, 284 Md. 70, 75, 394 A.2d 299, 302 (1978). When disputed questions of historical fact underlie the issue of accrual of a claim, however, a trial on the issue of accrual is required. In the instant case, I conclude that the relevant and material facts are indeed undisputed, and they are uncomplicated as well.

Doe underwent a cesarean section in January 1985 at St. Agnes Hospital in Baltimore. Following the operation, she was diagnosed with a blood coagulation disorder. As a result, on January 14, 1985, she received transfusions of two units of whole blood, which were supplied by Red Cross.

In the meantime, in 1984 and 1985, Doe underwent two additional, unrelated, surgical procedures at Johns Hopkins Hospital ("Hopkins") in Baltimore. Those operations were performed by the now deceased Dr. Rudolph Almaraz. In 1990, Dr. Almaraz died of AIDS.[2] The public disclosure that a surgeon at the world-renown Hopkins was infected with HIV stirred a major media explosion in the Baltimore area and elsewhere. Doe became aware of Dr. Almaraz's condition and death as a result of a December 1990 article in the *Baltimore Sun* newspaper. Subsequently, Doe received a letter from Hopkins advising her of Dr. Almaraz's death and its cause. Although the letter noted that the risk of having contracted HIV through contact with Dr. Almaraz was "negligible," Hopkins was nevertheless offering to test all of Dr. Almaraz's former patients.

Prior to being tested by Hopkins, Doe contacted an attorney, Steven R. Tully, Esq. ("Tully").[3] She stated that she contacted him first "[b]ecause [she] felt that he was better [able] to investigate it than [her]self." Doe Dep. at 118. On Tully's advice to do so, Doe underwent testing on December 7, 1990.

---

1. The law governing Doe's claims is that of the forum state, Maryland. *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

2. *See generally Faya v. Almaraz*, 329 Md. 435, 440–41, 620 A.2d 327, 329 (1993).

3. Doe is not represented by Tully in this action.

She learned approximately one week later that she was positive for HIV.

Shortly thereafter, in January 1991, Tully instituted damage claims on Doe's behalf by filing a complaint with the Health Claims Arbitration Office, Md.Code Ann., Cts. & Jud.Proc. §§ 3–2A–01 *et. seq.,* (1974, 1995 Repl.Vol. & 1995 Supp.), against Dr. Almaraz, his estate and Hopkins.[4] Early in those proceedings, Hopkins' counsel sent a letter, dated March 7, 1991, to Tully. The letter explained, *inter alia,* that Hopkins was willing to provide Doe with drug therapy for her condition. Df.'s Mem. of Points and Auth. in Supp. of its Mot. for Summ.J.Ex. 18. The letter went on to say, however, that

> [i]f there is a demonstration that the transfusion that [Doe] received was a source of the problem, and reimbursement is made from that entity to [Doe], then as we discussed, that reimbursement might be an appropriate source of money from which to reimburse the Hospital for the care we have discussed.

*Id.*

In addition, counsel for the Almaraz estate sent Tully a letter, dated June 5, 1991, which made reference to the 1985 transfusions as a possible source of Doe's HIV exposure. *Id.* Ex. 16A. The letter summarized a previous phone call. It stated, in part, as follows:

> As I relayed to you on the phone, I have also asked Dr. Rodgers [a state health official] about the inquiries being made by the [Maryland] Health Department concerning the blood transfusions that your client received at St. Agnes Hospital in January, 1985. I understand that there were two units of blood involved, from separate donors, and that both units were obtained by St. Agnes Hospital from the Red Cross. For that reason, Dr. Rodgers has been working with representatives of the Red Cross in an attempt to ascertain

whether either of these donors is or was HIV positive....

\* \* \* \* \* \*

At this point, I believe that the Health Department is doing whatever it can, in conjunction with the Red Cross and the [Centers for Disease Control], to address the two issues about which you expressed concern when we spoke on the telephone: tracking down information about the blood donors and testing tissue samples of Dr. Almaraz.

*Id.* Tully responded by a letter dated June 7, 1991. *Id.* Ex. 16B. In his letter, Tully stated that he "too had called Dr. Audrey Rodgers...."[5] *Id.* Moreover, he specifically mentioned that certain information being sought by opposing counsel should either be in the defendants' "possession or available from ... St. Agnes Hospital where the transfusions took place." *Id.* See also Tully Aff'd ¶ 10.

Meanwhile, Red Cross made attempts to contact the donors of the two units of blood which Doe had received in 1985. It ultimately reached both donors. One tested negative for HIV. The other donor met with a representative of Red Cross, and in an interview "he did acknowledge having been tested and being HIV positive." Harper Dep. at 54. On May 31, 1991, a lab report confirmed the donor's status as HIV positive. *Id.* at 57. In early June 1991, Red Cross notified the Maryland Department of Health and Mental Hygiene of the results of its investigation. *Id.* 54, 57 & Dep.Ex. 10.

In late December 1991, Doe and Tully learned that Dr. Almaraz was not the source of Doe's HIV infection. She subsequently dismissed her complaint against him, his estate and Hopkins. On November 1, 1994, Doe instituted the present action against Red Cross alleging that she became infected with HIV through her 1985 transfusions.[6]

---

4. In 1991, medical malpractice claims in Maryland were subject to mandatory administrative review prior to judicial action.

5. In his affidavit, Tully asserts that Dr. Rodgers was not forthcoming with information in her conversation with him, and specifically, that she had made no mention of the transfusions as a

possible source of Doe's HIV infection to him. Tully Aff'd ¶¶ 8–9. Interestingly, Tully's affidavit is silent as to whether he *asked* Rodgers about the transfusions.

6. Of course, the merits of Doe's claims are not before the Court at this time.

(ii)

■ Red Cross argues that Doe had three years from the date she learned of her HIV positive condition in which to institute her suit against it.[7] In the alternative, Red Cross contends that Doe had three years from the time her attorney learned of the 1985 blood transfusions in early 1991. Doe, on the other hand, maintains that she had three years from late December 1991, when she in fact learned that Dr. Almaraz was not the source of her infection and that the probable source was the 1985 transfusions.

■ The controlling statute of limitations is § 5–101 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code. Section 5–101 reads:

> A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

The key term in the statute is "accrues." As it has not been statutorily defined "the task of determining when an action accrues [is left] to the judiciary." *Pennwalt*, 314 Md. at 437, 550 A.2d at 1157. The Maryland Court of Appeals has a long history of determining when a cause of action "accrues" under the statute. *See generally id.* at 437–52, 550 A.2d at 1157–65. At common law, the limitations period began to run, i.e., a claim accrued, from the date of the alleged wrong. *Harig*, 284 Md. at 76, 394 A.2d at 302; *Hahn v. Claybrook*, 130 Md. 179, 100 A. 83 (1917). However, based on policy considerations underlying the principle behind the statute and in the interest of fairness to blameless victims, *Harig*, 284 Md. at 78–80, 394 A.2d at 303–05, the court carved out certain exceptions to the statute, including "the discovery rule," *id.* at 76, 394 A.2d at 303. In 1981, the Maryland Court of Appeals held that the exception had become the rule. Thus, "the discovery rule [became] applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffen-*

berger v. Risser, 290 Md. 631, 636, 431 A.2d 677, 680 (1981).

■ Justification for the discovery rule is rooted in the recognition that under certain circumstances the plaintiff is unaware that she has been wronged until after the date the wrong actually occurred. *See generally Pennwalt*, 314 Md. 433, 550 A.2d 1155. Where it is applicable, the rule tolls the beginning of the statute of limitations until the plaintiff has, or is charged with having, actual knowledge of the injury and its cause. *Id.* at 442–43, 550 A.2d at 1160; *Harig*, 284 Md. at 83, 394 A.2d at 306. Actual knowledge may be "either express or implied.... [I]mplied actual knowledge [is] that knowledge that would in all probability have resulted from a diligent investigation pursued upon awareness of circumstances that would cause a reasonable person to investigate." *Pennwalt*, 314 Md. at 442–43, 550 A.2d at 1160. This does not mean that in cases of implied knowledge the beginning of the limitations period is tolled "until the end of an additional period deemed reasonable for making the follow-up investigation." *Id.* at 447–48, 550 A.2d at 1163 (citing *O'Hara v. Kovens*, 305 Md. 280, 288–89, 503 A.2d 1313, 1317–18 (1986)). Rather, the limitations period begins to run once the plaintiff has sufficient knowledge to have "prompt[ed] a reasonable person to inquire further," i.e., once the plaintiff is on "inquiry notice." *Id.*

> Therefore, in simple terms, a plaintiff is only on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has "knowledge of circumstances which would cause a reasonable person to undertake an investigation which, if pursued with reasonable diligence, would have lead to knowledge of the alleged [tort]." *O'Hara*, 305 Md. at 302, 503 A.2d at 1324. In such a situation, should the plaintiff fail to seek out the facts supporting a cause of action, it can fairly be said that the plaintiff has inexcusably slept on his rights.

*Id.* at 448–49, 550 A.2d at 1163 (alterations in the original). *Accord Poffenberger*, 290 Md. at 637, 431 A.2d at 681 (plaintiff charged with

---

7. The contention is not at all frivolous. Nevertheless, for purposes of summary judgment, I shall proceed on the assumption that Tully was

without substantial knowledge of the transfusions until the last of the exchange of correspondence recounted in text.

knowledge of all facts which investigation would have revealed).

A useful example of Maryland courts' application of the discovery rule, containing an oft-cited explication of "inquiry notice," can be found in *Lutheran Hospital of Maryland v. Levy*, 60 Md.App. 227, 482 A.2d 23 (1984), *cert. denied*, 302 Md. 288, 487 A.2d 292 (1985). The plaintiff, Levy, broke her ankle in October 1973. She was initially treated for her ankle at Lutheran Hospital, where it was set in a cast. At some point, a Lutheran Hospital physician advised her to stop using crutches, obtain orthopedic shoes, and to begin walking on the ankle. She was discharged from treatment by her physician at Lutheran in February 1974.

In April 1974, Levy was still experiencing pain in her ankle and, as a result, she saw a different doctor at Mercy Hospital. The Mercy doctor, according to Levy, told her that "her ankle 'was all messed up,' asked 'who the hell told you to walk on that ankle?' and told her her ankle 'wouldn't get any better.' Ms. Levy said that it was then she first formed the belief that there was a problem." *Id.* at 233, 482 A.2d at 25–26. Nonetheless, she did not consult an attorney until early 1975, and it was not until July 1977 that a doctor examined the 1973 x-rays from Lutheran Hospital "and rendered an opinion that malpractice had occurred." *Id.* at 234, 482 A.2d at 26. Suit was filed in June 1978, and the jury returned a substantial verdict in favor of Levy.

On the hospital's appeal, the critical question for the *Levy* court was: At what point was Levy on inquiry notice such that her negligence claim against Lutheran accrued? The trial court had ruled that the action accrued six months after "the date from which the existence of a viable claim should have been known." *Id.* at 235, 482 A.2d at 26. In support of the judgment, Levy not only urged the appellate court to adopt the trial court's reasoning, but she also argued in the alternative that her claim accrued no earlier than July 1977 when her doctor examined her 1973 x-rays and stated his opinion that there had been malpractice. She contended that "[i]t was only then ... that she

had 'actual knowledge' of a viable claim against Lutheran." *Id.*

The Maryland Court of Special Appeals rejected both of the approaches urged by Levy. Instead, according to the court, the statute began to run when, having seen the doctor at Mercy Hospital in April 1974, Levy formed a belief that some wrong had occurred. *Id.* at 236, 482 A.2d at 27. The court held, therefore, that as a matter of law, a reasonable individual would have undertaken an investigation as of that time, and that Levy was charged, as of the date she was seen by the Mercy doctor, with the knowledge she would have obtained from a reasonably diligent investigation. *Id.* at 237, 482 A.2d at 27. The court went on to explain why the beginning of the limitations period is not tolled until after allowing time for an investigation:

> This application of the discovery rule serves the legislative policy that underlies the statute of limitations, and at the same time puts the discovery rule claimant on a par with the claimant who has actual knowledge at the time of the tort such as the normal automobile-accident plaintiff. The latter has three years from the date of the accident within which to investigate further, obtain expert opinion, discuss settlement, and file suit. The former is given the same time period within which to do these things, beginning from the date that circumstances have put her to that inquiry that charges her with knowledge of the additional information that might be gleaned from a reasonably diligent investigation conducted within the three-year period.

*Id.* at 238, 482 A.2d at 28.

As for Levy's contention that her claim did not accrue until July 1977, when the doctor examined the 1973 x-rays and formed an opinion that there had been malpractice, the court explained that "[t]he crucial date is the date the claimant is put on inquiry, not the date an expert concludes there has been malpractice." *Id.* at 240, 482 A.2d at 29. A contrary view, according to the court, would frustrate the purpose behind the statute of limitations:

> Under Ms. Levy's view, all the historical facts pertaining to an injury could occur,

the claimant could be well aware that she had been injured, but no cause of action would accrue until, perhaps decades later, an expert concluded that the physical harm had been the result of malpractice. We do not think the discovery rule countenances that.

*Id.*

Significantly, the Court of Special Appeals noted that Levy possessed only a ninth grade education and that she was not knowledgeable about medicine. *Id.* at 236, 482 A.2d at 27. Nevertheless, the court held that her visit to Mercy Hospital "did not occur in a vacuum." *Id.* She pursued treatment because she continued to experience pain. In addition, the court gave no weight to the fact that Levy's original suspicion about the cause of her injury did not turn out to be the actual cause. *Id.* at 237, 482 A.2d at 27.[8] According to the court, a "[r]easonably prompt investigation would have developed its precise nature." *Id.* *See also Pennwalt,* 314 Md. at 456–57, 550 A.2d at 1167 (holding that the statute of limitations begins to run when the plaintiff has either express or implied knowledge of probable cause and probable tortfeasor); *Conaway v. State,* 90 Md.App. 234, 251–54, 600 A.2d 1133, 1141–42 (1992) (holding that knowledge of the identity of the particular defendant responsible for plaintiff's injury is not essential to the beginning of the limitations period, citing *Pennwalt,* 314 Md. at 435, 550 A.2d at 1155, and *Ferrucci v. Jack,* 255 Md. 523, 525–26, 258 A.2d 414 (1969)).[9] Accordingly, the court held that Levy's claims were time barred.

An example of a case in which the asserted reasonableness of a plaintiff's delayed investigation presented a question of fact rather than a question of law is seen in a products liability case, *Baysinger v. Schmid Prod. Co.,* 307 Md. 361, 514 A.2d 1 (1986). In *Baysinger,* the plaintiff had an intrauterine contraceptive device ("IUD") surgically inserted in May 1979. In November of that same year, she began to experience abdominal pain and the IUD was removed. The following month she was admitted to the hospital, and she was diagnosed as having acute peritonitis with bilateral tubo-ovarian abscesses. At that time, when she inquired of her treating doctors as to a possible connection between the IUD and her resulting condition, they were unable to give her a firm answer. Instead, they informed her that although the IUD may have been the cause, there was no way to determine whether it was in fact the IUD or something else. In January 1983, however, Baysinger's sister came across a newspaper advertisement which suggested possible causation. Subsequently, on January 17, 1983, more than three years from the onset of her abdominal pain and removal of the IUD, Baysinger obtained counsel and filed suit against the manufacturer of the IUD.

The trial judge, relying on *Levy,* held that the timing of the events should have suggested to Baysinger that " 'she "might have been wronged" by the device.' " *Baysinger,* 307 Md. at 365, 514 A.2d at 3. The trial judge explained further that the circumstances surrounding the November and December 1979 events would have put a reasonable person on notice; thus, Baysinger was charged as of that time with all the information that a reasonably diligent investigation would have revealed. *Id.* Therefore, the trial court held that, as a matter of law, her cause of action was time barred. The Court of Special Appeals affirmed in an unreported opinion.

The Court of Appeals reversed. The court held that based on the record before the trial court, the determination of whether Baysinger had sufficient knowledge of circumstances prior to January 1980 such that a reasonable person would have undertaken an investigation could not be decided as a matter of law but was a question of fact. *Id.* at 367, 514 A.2d at 4. The court explained as follows:

---

8. Levy thought her injury was caused by the premature instruction to walk on her ankle. In fact, the reason for her injury turned out to be that her ankle was not set correctly. *Id.*

9. *Cf. Hartnett v. Schering Corp.,* 2 F.3d 90 (4th Cir.1993) (holding, under Maryland law, that plaintiff's claim was time barred where she mistakenly pursued a claim against the manufacturer of a drug which she did not receive and a reasonably diligent investigation of her medical records would have revealed which drug she had in fact received).

While the sparse record of facts before the trial judge demonstrated that Mrs. Baysinger's suspicions concerning the cause of her infection included the intrauterine device, it also showed that she initiated a preliminary investigation by discussing her suspicions with [one of her doctors], and [he] told her he had "no way of determining whether her infection was caused by the [IUD] or by some other unrelated occurrence or instrumentality." The record further discloses that at that time [her other doctor] had no idea of what caused her illness, and consequently further investigation by way of inquiry [through him] would have been fruitless. We further note that while the record indicates that Mrs. Baysinger entertained various suspicions concerning the cause of her illness, there is no evidence that she then suspected, or reasonably should have suspected, wrongdoing on the part of anyone. Whether a reasonably prudent person should then have undertaken a further investigation is a matter about which reasonable minds could differ, and it was therefore inappropriate for resolution by summary judgment.

*Id.* Accordingly, the case was remanded to the trial court. Doe relies heavily on *Baysinger* here.

(iii)

After a careful examination of the circumstances presented in the instant case, I am persuaded that the case is controlled by *Levy* rather than *Baysinger.* As set forth *supra,* it is apparent from the correspondence between Tully, Hopkins' counsel and counsel for the Almaraz estate, that the 1985 blood transfusions were brought to Tully's attention as a possible source of Doe's infection in March and June 1991. In determining whether a plaintiff is charged with knowledge of facts which should have put her on inquiry, it is clear that "notice to an attorney is notice to his client...." *Williams v. Skyline Dev. Corp.,* 265 Md. 130, 165, 288 A.2d 333, 353 (1972). *See also Kimm v. Andrews,* 270 Md. 601, 621, 313 A.2d 466, 477 (1974); *Fertitta v. Bay Shore Dev. Corp.,* 266 Md. 59, 72–73, 291 A.2d 662, 669 (1972). I am convinced that no reasonable juror could rationally conclude, in the face of the information which Tully had at the time with respect to the transfusions, that a reasonable person would not have investigated the possibility that the transfusions were in fact the source of Doe's infection. Thus, as a matter of law, Doe's claims accrued, at the latest, in June 1991. Furthermore, it is manifest from the record that, within three years from as late as June 1991, a reasonably diligent investigation would have revealed (as it did in fact reveal) that a blood donor was the source of Doe's HIV infection. *See* Tully Aff'd ¶ 12 (in Spring 1992, Tully learned that Dr. Almaraz was not the source of Doe's HIV infection and that the Red Cross donor was the probable source). By June 1991, Tully was on inquiry notice and, therefore, he (and thus, Doe) is charged with actual knowledge of Doe's cause of action against Red Cross by that time. "Such knowledge of her cause of action more than three years before she sued, if not actually known (connoting legally understood) to her, was imputable to her through her counsel as a matter of law." *Johnson v. Nadwodny,* 55 Md.App. 227, 236, 461 A.2d 67, 72 (1983).

In seeking to avoid this result, Doe relies heavily upon the fact that she had but a tenth grade education, that she was not trained in medicine, Pl.'s Mem. in Opp. to Df.'s Mot. for Summ.J. at 8, and that her belief that Dr. Almaraz was the source of her infection was reasonable, *id. passim.* Moreover, Doe vigorously argues that she did not in fact learn that Dr. Almaraz was not the source of her infection and that the Red Cross donor was the probable source, until late December 1991 or early Spring 1992. *Id.* at 11–13. Neither set of circumstances, however, is sufficient to toll the beginning of the limitations period.

First, Doe's educational attainment or general sophistication became a non-issue as soon as she hired Tully to investigate and litigate her potential claims. Tully, as an attorney, is charged "with knowledge of the law, including the period of limitations applicable to claims of the sort asserted here." *Chapman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 597 F.Supp. 623, 627 (D.Md. 1984). Although Tully was free to pursue

claims against the earlier defendants, "he was charged with the knowledge that the applicable statute of limitations would not be tolled while he sought to resolve" Doe's claims against those parties. *Id.* "Thus, even if [Doe] did not know or appreciate the significance ... of the statements ... of [the Almaraz] defendant[s' counsel], it is clear that [her] attorney did. Such knowledge must be imputed to [Doe] so that [her] claims are time-barred whatever the degree of [her] ... sophistication." *Id.* at 627–28.

Tully's suggestion that he believed opposing counsel's reference to the 1985 transfusions was an "attempt[ ] to shift the causation to that focal point" because "there was no reasonable basis for me to suspect that her reference to the 1985 transfusions was anything more than advocacy on behalf of the Almaraz Defendants," is unfortunate. Tully Aff'd ¶ 10. It was not the duty of the "Almaraz Defendants" to undertake an investigation for Doe. In addition, the Court of Appeals for the Fourth Circuit explained in *Hartnett v. Schering Corporation,* "media coverage, medical literature, and case law in existence" at the time should be considered in determining whether or not the plaintiff was on notice to undertake an investigation. 2 F.3d at 93.[10] Prior to June 1991, there was significant national media coverage devoted to the risk that blood transfusions in the early 1980's posed to their recipients. *See, e.g.,* Kim Paner, *How Safe is Blood Supply? 'Safer Than Ever' Say Some Others Worry Hindsight Brings Fears, Probe, Suit,* U.S.A. Today, Aug. 2, 1990, at 1A; Amy Wilentz, *A Transfusion of Fear,* Time, Mar. 30, 1987, at 24; Larry Martz, et al., *A New Panic Over AIDS,* Newsweek, Mar. 30, 1987, at 18; David A. Rolling, Comment, *Transfusion–Associated Acquired Immunodeficiency Syndrome (AIDS): Blood Bank Liability?,*

16 Balt.L.Rev. 81 (1986). See also the Df.'s Mem. of Points and Auth. in Supp. of its Mot. for Summ.J. at 17 & n. 5, collecting cases and legal journal articles demonstrating that there was significant litigation taking place over HIV transmission through blood transfusions prior to 1991. "In such a situation, [where] the plaintiff fail[ed] to seek out the facts supporting a cause of action, it can fairly be said that the plaintiff has inexcusably slept on [her] rights." *Pennwalt,* 314 Md. at 449, 550 A.2d at 1163.

As for when Doe in fact became aware that Dr. Almaraz was not the source of her infection (including the reasonableness of her prior belief that he had in fact been the source) and that the Red Cross donor was the probable source, the law is clear that actual knowledge of the cause of the injury may be express or implied. *Pennwalt,* 314 Md. at 442–43, 550 A.2d at 1160. Implied actual knowledge includes knowledge of facts which in all probability would have been discovered by a reasonably diligent investigation. *Id.; see also id.* at 457, 550 A.2d at 1167 ("[K]nowledge means express or implied knowledge of injury, its *probable* cause, and *probable* [source]. . . .") (emphasis added). Furthermore, as the court explained in *Levy:* "The crucial date is the date the claimant is put on inquiry, not the date an expert concludes there has been malpractice." 60 Md. App. at 240, 482 A.2d at 29.

As in *Levy,* the plaintiff here had strong suspicions that some wrong had occurred. Moreover, she had acted reasonably in retaining counsel and they had begun an investigation, beginning with their joint decision that she should be tested. Nevertheless, Doe, like Levy, took her time and failed to conduct a reasonably diligent investigation and to initiate a lawsuit within three years of the time from when she was on inquiry.[11]

**10.** Doe does not dispute the significance of media coverage in the context of discovery rule jurisprudence. *Cf.* Tully Aff'd ¶ 4 ("Both Jane Doe and I were convinced [in early 1991], based on ... the press [reports] being generated at that time about Dr. Almaraz that her HIV infection came from her contact with Dr. Almaraz.").

**11.** Tully seemingly admits that he delayed an investigation into the transfusions in the apparent hope that an investigation by the State of

Maryland into the circumstances surrounding all of Dr. Almaraz's patients would lessen the financial or other burdens which would be attendant to a full-fledged investigation into the source of Doe's infection. *See* Tully Aff'd ¶ 8 ("I was hopeful that the State's investigation, utilizing their resources and experts, would prove an essential element of Jane Doe's claim. . . .").

Tully describes this approach as "reasonable." *Id.* ¶ 11. From the point of view of his relationship with his client, in light of her circumstances

This case is not at all like *Baysinger.* The plaintiff there began an investigation, but was told (authoritatively, by medical professionals) that there was no way to determine if any wrong had occurred or what the source of any wrong may have been. Moreover, the court in *Baysinger* observed that there was "no evidence that she then suspected, or reasonably should have suspected, wrongdoing on the part of anyone." 307 Md. at 367, 514 A.2d at 4. That is clearly not the case here where the plaintiff has hired an attorney and initiated litigation precisely because of her belief that she acquired her infection through wrongdoing.

(iv)

In sum, Doe's claims are time barred because reasonable minds could not disagree that as of June 1991, at the latest, a reasonable person would have pursued a diligent investigation into the possibility, if not the likelihood, that the source of her HIV infection was one of the donors who provided the whole blood products she received in the 1984–85 transfusions. Thus Doe's claims accrued, at the latest, in June 1991. The instant case was not instituted until November 1, 1994, more than three years after Doe's claims accrued. Accordingly, Red Cross is entitled to judgment as a matter of law. A separate order is entered herewith.

ORDER

In accordance with the foregoing Memorandum Opinion, it is this 25th day of April 1996, by the United States District Court for the District of Maryland,

(1) ORDERED that American National Red Cross's Motion for Summary Judgment BE, and it hereby IS GRANTED, and judgment hereby is entered in favor of the Defendant; and it is further

(financial and otherwise) at the time, it may well have been "reasonable" to abjure a costly investigation and to await the outcome of the efforts of others designed to uncover the same or similar information. Nevertheless, the issue here is not whether it was reasonable to delay an investigation of a second (or third or fourth) potential

(2) ORDERED that the Clerk of the Court CLOSE this case.

defendant while an investigation (by others) goes forward as to the first potential defendant. Maryland law simply does not support such a "seriatim" application of the discovery rule where a potential plaintiff is on inquiry notice of her victimization.