**HELINSKI, et al.,**

v.

**APPLETON PAPERS, et al.**

Civil Nos. 93–3784, 94–2032, 94–2047, 94–2048.

United States District Court, D. Maryland.

Jan. 31, 1997.

Michael A. Pretl, Baltimore, MD, for plaintiffs.

William F. Ryan, Jr., Whiteford, Taylor & Preston, Baltimore, MD, John B. Isbister, Tydings & Rosenberg, Baltimore, MD, Brian L. Wallace, Wallace & Whitney, Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiffs Mary Patricia Helinski, Ann Holcomb, Mildred Miller–Jackson and Brenda Smith bring these diversity actions against several paper manufacturers. Plaintiffs claim that their exposure to defendants' carbonless copy paper (CCP) caused a variety of ailments broadly termed formaldehyde sensitization or multiple chemical sensitivity. Plaintiffs seek recovery under several theories, including negligence, breach of warranty, and strict liability. Defendants move for summary judgment, primarily on the ground that plaintiffs' claims are barred by the applicable statutes of limitations in Maryland and Virginia.

### I.

#### A.

Plaintiff Helinski is a Maryland resident. As a service representative for the former Chesapeake and Potomac Telephone Company of Maryland (C & P), now Bell Atlantic, Helinski first used CCP forms in approximately 1982. Until 1984, Helinski worked at C & P's York Road office in Baltimore, and

experienced no health problems. In 1984, Helinski was reassigned to C & P's Riva Road office in Annapolis.

Helinski's health complaints began in January 1989, coinciding with the onset of renovations to the Riva Road business office. The remodeling included the introduction of new carpeting, desks, cubicle enclosures, blinds, and paint. On or about February 15, 1989, Helinski visited her ophthalmologist, complaining of eye irritation, peeling and flaking of her eyelids and other vision problems. The ophthalmologist diagnosed Helinski with contact allergic dermatitis, but could not pinpoint its cause. Helinski also went to a C & P physician to discuss what might be causing her symptoms. Helinski took several CCP forms to her appointment, because she felt that the forms could be causing her symptoms. The C & P doctor could not determine the source of her symptoms.

Helinski continued to experience eye problems, as well as others such as dizziness, vertigo, headaches and respiratory difficulties. In discussions with co-workers and health professionals, Helinski voiced her suspicion that the CCP forms she was handling as part of her work duties were at least a partial cause of her illness. By late 1990, Helinski was convinced that her symptoms were work-related and not the result of her pregnancy or other factors. Helinski sought the advice of several physicians, who posited a variety of potential causes, including obesity, stress and reactions to makeup.

In mid–1991, Helinski was first told by physicians that CCP could be the cause of at least the dermatological symptoms she was experiencing. By 1992, after discussions with occupational health specialists, Helinski began to suspect that she was suffering from chemical hypersensitivity brought on by exposure to toxic substances in the workplace. Helinski conducted her own research on the subject, which led her to file this suit on November 15, 1993.

### B.

Plaintiff Ann Holcomb is a Virginia resident. From 1963 to 1993, Holcomb worked for C & P in various capacities in its Virginia offices. Holcomb first started working with CCP in 1987. By the summer and fall of 1990, Holcomb began to feel overly fatigued and had numerous headaches and sinus complaints. These symptoms continued, and worsened in the summer and fall of 1991, to include voice loss, dizziness and nausea. These exacerbated symptoms coincided with renovations to the office building in which Holcomb worked.

Holcomb sought the advice of several doctors, who advanced various theories for the cause of her complaints. In the fall of 1991, Holcomb was told that her problems could be the result of exposure to harmful substances at work. In February of 1992, Holcomb was diagnosed with multiple chemical sensitivity.

Holcomb filed suit in Virginia state court on July 23, 1993, alleging the same causes of action as in the present case. Holcomb's action was "nonsuited," or voluntarily dismissed without prejudice, on July 13, 1994. Nine days later, Holcomb filed this action.

### C.

Plaintiff Mildred Miller–Jackson is a Virginia resident, who began working for C & P in 1956. Miller–Jackson began working with CCP in the early 1980's. By the mid–1980's, Miller–Jackson began to experience frequent sinus problems and other health complaints. These complaints persisted until the summer of 1991, when the installation of a new roof on her office building appeared to exacerbate her symptoms. Miller–Jackson claims to have become chronically ill in mid–1991, and in February of 1992 she was diagnosed with multiple chemical sensitivity. Like Holcomb, Miller–Jackson filed suit in Virginia state court on July 23, 1993. The claim was nonsuited in 1994, shortly before the instant action was filed.

### D.

Plaintiff Brenda Smith is a Virginia resident who began working for C & P in 1966. Smith was first exposed to CCP in the early 1980's, and soon thereafter began to have problems with her sinuses. Over time, her symptoms widened to include neurological complaints such as fatigue, dizziness, and difficulty concentrating. While Smith was

treated for her sinus problems throughout the mid- to late–1980's, it was not until the summer of 1991, while she was working at the same location as plaintiff Miller–Jackson, that her symptoms worsened. Smith, like Miller–Jackson, attributes this exacerbation to the installation of a new roof at her office, allegedly sealing in toxic materials. Smith saw several physicians for her sinus and respiratory problems after mid–1991. In early 1992, after visiting the same physician who treated Miller–Jackson, Smith was diagnosed with multiple chemical sensitivity. Like Holcomb and Miller–Jackson, Smith filed suit in Virginia state court in 1993, nonsuited in 1994, and filed the instant action shortly thereafter.

## II.

Plaintiff Helinski's claims are governed by Maryland's general three-year limitations period. Md.Code Ann., Cts. & Jud.Proc. § 5–101 (1995).[1] The crucial question in this case is when the plaintiff's claim accrued. In *Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677, 680 (1981), the Court of Appeals applied the "discovery rule" to all claims in Maryland, holding that a cause of action accrues when the plaintiff knows or reasonably should know of the alleged wrong at issue. *Poffenberger* was the final step in the discovery rule's evolution from the exception to the general rule in Maryland.

■ Maryland law has also addressed the application of the discovery rule to product liability actions. The Court of Appeals held in *Pennwalt Corp. v. Nasios,* 314 Md. 433, 448–49, 550 A.2d 1155, 1163 (1988), that in general, a plaintiff is put on inquiry notice, and the statute of limitations begins to run, when: (1) the plaintiff has knowledge of circumstances which would cause a reasonable person in the plaintiff's position to undertake an investigation; and (2) that investigation, if pursued with reasonable diligence, would lead to knowledge of the alleged tort. More specifically, in products liability actions, a cause of action accrues when the plaintiff knows or should know: (1) she has suffered

injury; (2) the injury was probably caused by the defendant; and (3) there was probably manufacturer wrongdoing or a product defect. *Id.* at 455–56, 550 A.2d at 1167. "Clear and unequivocal proof" of manufacturer wrongdoing or a product defect is not required; rather, express or implied knowledge of each element is sufficient to trigger the limitations period. *Id.* at 456–57, 550 A.2d at 1167. A plaintiff's mere suspicions are not sufficient to constitute inquiry notice, however. *Baysinger v. Schmid Prods. Co.,* 307 Md. 361, 367, 514 A.2d 1, 4 (1986).

While the parties in the present case agree that this analytical structure controls, and also do not dispute most of the relevant facts, they come to very different conclusions regarding the application of these facts to the *Pennwalt* test. Defendants emphasize that Helinski believed CCP to be a potential cause of her health problems by early 1989, five years before filing suit. Defendants attach special importance to the fact that in her March 1989 visit to a C & P physician, Helinski brought along CCP forms in an effort to determine whether they could be causing at least some of her problems. These facts, defendants allege, indicate that more than three years before filing suit Helinski possessed enough information to cause a reasonable person to investigate further, thereby triggering the limitations period.

Plaintiff does not dispute the facts underlying defendants' assertions, but claims that she did not receive inquiry notice until much later. Helinski points out that physicians gave contradictory diagnoses of her problems until well after 1989, and claims that it was not until she received information regarding chemical sensitivity in late 1991 that she was prompted to investigate the role of CCP in her illness. In general, Helinski argues that the relevant facts regarding her knowledge of causation and product defect are disputed and cannot be determined as a matter of law, precluding summary judgment.

Causation plays an especially important role in this case. Normally, the most impor-

1. Section 5–101 provides: "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

tant question regarding accrual is when the plaintiff possesses enough information to undertake an investigation into her injury. Once this investigation begins, it is often relatively simple to discover the causal connection between the plaintiff's injury and the defendant's product. In the case at hand, however, because the medical community is still divided regarding the existence of CCP-caused health problems, the second question enunciated by *Pennwalt* assumes more importance: when would the plaintiff's investigation have led to knowledge of the alleged tort?

Defendants argue that the decisions of the district court and the Fourth Circuit in *Hartnett v. Schering Corp.*, 806 F.Supp. 1231, 1233 (D.Md.1992), *aff'd*, 2 F.3d 90 (4th Cir. 1993), support the conclusion that Helinski was put on inquiry notice by 1989 or 1990. In *Hartnett*, the plaintiff was informed in 1981 that she would have difficulty giving birth because of her *in utero* exposure to the drug DES. The plaintiff discovered that her mother had unsuccessfully attempted to ascertain whether she had been given DES during her pregnancy, but the plaintiff undertook no further investigation. *Id.*

The court granted summary judgment for the defendant, finding that the plaintiff had knowledge of her cause of action more than three years before filing suit. *Id.* at 1235. First, the court found that after being told in 1981 of her exposure to DES, the plaintiff knew of facts sufficient to cause a reasonable person to investigate further. *Id.* Second, the court found that if the plaintiff had undertaken an investigation, she would have discovered that: (1) her mother had taken DEN, a drug similar to DES; (2) the DEN was manufactured by the defendant's subsidiary; and (3) there was probable manufactur-

er wrongdoing or product defect, as evidenced by previous lawsuits and FDA action against the defendant. *Id.* at 1235–36. The Fourth Circuit later affirmed the trial court's decision, agreeing that the plaintiff ceased to be "blamelessly ignorant" more than three years before filing suit. 2 F.3d at 93.

Defendants point out that in *Hartnett* the court found that the plaintiff had sufficient information to require further investigation when she was told that she had *probably* been exposed to DES. Similarly, defendants argue, Helinski had enough information to investigate well before November 15, 1990, three years before filing suit. What defendants fail to address, however, is *Pennwalt's* second requirement, that in order for the limitations period to start running, the plaintiff's investigation must be able to unearth knowledge of the alleged tort.

In *Hartnett*, both of *Pennwalt's* requirements were met, because upon investigation the plaintiff could readily determine by reviewing her mother's medical records that she had been exposed to DEN. She could also ascertain that DEN was manufactured by the defendant, and most importantly, that DEN was known to cause problems in the children of those women who took the drug. 806 F.Supp. at 1235–36. Once plaintiff's physician stated conclusively that the symptoms exhibited by the plaintiff were the "stigma of a DES-affected daughter," plaintiff had all the information she needed. *Id.* at 1233 (internal quotation marks omitted). In the present case, by contrast, while Helinski undertook an investigation once she was injured, she could not obtain the information necessary to make a causal connection between CCP and her injuries for some time.[2]

Defendants make much of the fact that when Helinski went to see physicians, she

---

2. In making this point, the plaintiff relies on the decision of the Court of Appeals in *Baysinger*. In that case, the plaintiff suffered injuries that she suspected might have been caused by her intrauterine contraceptive device. 307 Md. at 363–64, 514 A.2d at 2. The court found that because the plaintiff's physician said there was "no way of determining" whether the plaintiff's injuries were caused by the device, it was unable to find as a matter of law that the plaintiff had sufficient knowledge even to cause her to undertake further investigation. *Id.* at 367, 514 A.2d at 4.

However, defendants point out that unlike in *Baysinger*, where plaintiff was discouraged from pursuing further inquiries, in the present case plaintiff's physician simply stated that while he did not know what had caused her injuries, he encouraged further investigation, as it "could be anything." As a result, Helinski likely had enough information to investigate further. Nevertheless, Helinski's essential point remains true; if her allegations are correct, a further inquiry would have been fruitless.

already suspected that CCP could be causing her problems. The record indicates, however, that numerous visits to physicians failed to substantiate these suspicions. As noted *supra*, in her first visit to a C & P physician, Helinski was told that her symptoms could be caused by any of several substances, and that the physician had no way of knowing for certain which one was responsible. Subsequent visits with other physicians were equally inconclusive. It was not until mid-1991 that a physician first advised Helinski that at least some of her symptoms could be caused by exposure to CCP, and recommended that she minimize her contact with CCP and avoid having it stored in her vicinity.

Two decisions cited in *Pennwalt* that addressed similar situations are instructive in this regard. In *Knaps v. B & B Chem. Co., Inc.*, 828 F.2d 1138, 1139 (5th Cir.1987), the plaintiff believed that a soap he used at work was causing a skin disorder. The plaintiff sought out several doctors, none of whom acknowledged any causal connection to the soap. *Id.* It was not until four years after the plaintiff's exposure that a physician made a connection between the skin disorder and the soap. *Id.* The trial court granted summary judgment for the defendants under the applicable limitations period. *Id.* The Fifth Circuit reversed this ruling, finding that "[w]e cannot say, as a matter of law, that an injured party acts unreasonably by delaying a lawsuit because the party's doctors consistently deny that a suit would be justified." *Id.* at 1140.

Similarly, in *Stoleson v. United States*, 629 F.2d 1265, 1266 (7th Cir.1980), the plaintiff suffered angina attacks that she suspected were caused by withdrawal from the nitroglycerin to which she was exposed at a munitions plant. Several doctors denied that such exposure could be causing the plaintiff's ailment. *Id.* at 1267. Finally, one physician documented the relationship between angina and exposure to nitroglycerin. *Id.* The trial court found the plaintiff's claim to be time-barred, but the Seventh Circuit reversed, stating that only after the link between her symptoms and nitroglycerin was documented did she have the requisite knowledge of cau-

sation. *Id.* at 1270–71. The plaintiff's suspicions were not enough to trigger the limitations period, the court stated, because "[a] layman's subjective belief, regardless of its sincerity or ultimate vindication, is patently inadequate to go to the trier of fact." *Id.* at 1270.

Defendants contend, however, that waiting to commence the limitations period until a plaintiff receives conclusive evidence of causation would gut the inquiry notice requirement underlying Maryland's statute of limitations. Indeed, *Pennwalt* and other cases confirm that irrefutable proof of causation is not required to trigger the limitations period. *Pennwalt*, 314 Md. at 456–57, 550 A.2d at 1167; *Doe v. American Nat'l Red Cross*, 923 F.Supp. 753, 757 (D.Md.1996) ("[t]he crucial date is the date the claimant is put on inquiry, not the date an expert concludes that there has been [a tort].") (quoting *Lutheran Hosp. of Md. v. Levy*, 60 Md.App. 227, 240, 482 A.2d 23, 29 (1984)).

This case is especially difficult, because it is disputed whether any causal link exists at all between CCP and workplace ailments. Other jurisdictions have considered the proof of causation necessary in similar cases. At least one court held that where it takes medical science many years to recognize a causal connection between a plaintiff's injury and a particular substance, the limitations period does not run until that connection is made. *Stoleson*, 629 F.2d at 1271. Most courts considering such cases have rejected this position, however, in favor of a rule that the limitations period is triggered when a plaintiff is on notice that a substance has *likely* caused her injury. In *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 198 (1st Cir.1983), for example, the court noted that "[d]efining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits." The court rejected requiring conclusive proof of causation in cases involving "inherently unknowable wrongs," holding instead that a physician's opinion regarding causation puts a plaintiff on notice if it is not "neutral, ambiguous, hypothetical or phrased in terms of mere possibility." *Id.* at 199–200. The

court noted only one possible exception to this rule, when advances in medical knowledge establish a causal connection that was once inconclusive. *Id.* at 200.

Similarly, in *Dawson v. Eli Lilly & Co.*, 543 F.Supp. 1330, 1334 (D.D.C.1982), the court rejected the plaintiff's claim that "clear and certain knowledge" of causation was required. The court stated that "[i]f the statute of limitations did not begin to run merely because a plaintiff who knew of a possible causal relationship and did not rely on any representations to the contrary did not have *certain* knowledge of causation, no claim where causation could be disputed would ever accrue." *Id.* An exception was made only where a plaintiff relies on a defendant's denial of a causal relationship, as where a patient relies on her doctor's advice or a consumer relies upon a drug manufacturer's representations as to safety. *Id.*

■ Defendants' point is therefore well-taken, to the extent Helinski argues that knowledge of causation was not established until she had clear evidence from an expert that CCP was causing her health problems. *Pennwalt* and other cases do not require such a strong causal connection.[3] Defendants' further contention, however, that the statute of limitations was triggered by Helinski's mere *suspicions* of a causal connection, goes too far the other way. Based on the contradictory and inconclusive diagnoses Helinski received from 1989 until 1991, I find that Helinski had knowledge of the *probable*

cause of her injury in May of 1991 at the earliest, when physicians first suggested that CCP could be causing some of her symptoms. Before 1991, while no physician ruled out CCP as a cause, nobody provided Helinski with information making CCP a probable, rather than a possible, cause of her illnesses.

Defendants' claim that the limitations period was triggered when Helinski began her investigation in 1989 is flawed, because it confuses knowledge of injury and knowledge of a cause of action. *Pennwalt* cited with approval its previous decision in *Harig v. Johns-Manville Prods. Corp.*, 284 Md. 70, 83, 394 A.2d 299, 306 (1978), in which it held that a plaintiff must be aware that a *tort*, not merely an injury, has occurred. *Harig*, the *Pennwalt* decision stated, "made clear that an action accrues when the 'nature and cause of the injury,' and not merely when the nature of the injury, are known or should have been known." 314 Md. at 441, 550 A.2d at 1160; *accord Hartnett*, 806 F.Supp. at 1235 (plaintiff put on inquiry notice when informed that she suffered from DES stigma, not just injury); *Doe*, 923 F.Supp. at 759 (plaintiff on inquiry notice not when infected by AIDS virus in 1990, but when informed that infection was possibly caused by blood transfusions). Thus, the mere fact that Helinski attempted to determine the genesis of her health problems, and even suspected CCP might be a factor, was not enough to commence the limitations period.[4] Defendants'

3. Allowing a plaintiff to wait until she possesses clear evidence of causation would do violence to one of the purposes of statutes of limitations, to "grant repose to defendants when plaintiffs have tarried for an unreasonable period of time." *Doe v. Maskell*, 342 Md. 684, 689, 679 A.2d 1087, 1089 (1996) (quoting *Pennwalt*, 314 Md. at 437–38, 550 A.2d at 1158), *cert. denied*, — U.S. —, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997). Of course, this interest in repose has its limits. The *Pennwalt* court, for example, in deciding to require knowledge of wrongdoing or defect before commencing the limitations period, found that whatever uncertainty a defendant might face from the possibility of liability many years in the future was outweighed by society's interest in preventing plaintiffs from filing speculative suits in the hope that evidence of wrongdoing would emerge. 314 Md. at 454–56, 550 A.2d at 1166–67.

With regard to causation, however, less need exits for solicitude toward plaintiffs. If a plain-

tiff cannot marshal sufficient evidence to prove causation, her claim may simply be inherently weak, and there is no reason why the limitations period should not commence. *Fidler*, 714 F.2d at 200. As in *Fidler*, this is not a situation in which scientific understanding has advanced since the causal link between CCP and health complaints was first suggested to Helinski. To allow a plaintiff to postpone the running of the limitations period indefinitely in the hopes of a breakthrough in medical understanding would extend a defendant's potential liability for "defects" that at the time a product was manufactured were not discernible by anyone. Such a result does not just tip the balance against repose, but entirely eliminates it in some circumstances.

4. Because I have found that Helinski did not have knowledge of causation until after November 15, 1990, it is not necessary to determine when she acquired knowledge of wrongdoing or

motion must therefore be denied as to Helinski.

In deciding the limitations issue as I have, one important issue bears mentioning. Helinski has argued that her claim is not time-barred in part because the causal link between CCP exposure and formaldehyde sensitization is disputed. What enables Helinski to prevail at this stage of the litigation, however, may well eventually work against her. As noted earlier, *see supra* n. 3, it is unacceptable to hold a manufacturer indefinitely responsible for "defects" in a product that at the time of manufacture were impossible to discern. Courts have recognized this limitation on strict products liability by permitting the assertion of the "state of the art" defense, in which a defendant can escape liability in some situations by proving that any alleged defect was undetectable by the scientific or expert community at the time of production. *See, e.g., Owens–Illinois v. Zenobia,* 325 Md. 420, 431–38, 601 A.2d 633, 638–41 (1992); *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1164–65 (4th Cir.1986). Proving that a defect was impossible to discover would also be pivotal to a negligence analysis. If Helinski, through her expert witnesses, cannot prove a causal link between CCP exposure and health problems, such that defendants should have known of the potential for injury, her claim will not survive later stages of this litigation. *See Rutigliano v. Valley Bus. Forms,* 929 F.Supp. 779, 784–91 (D.N.J.1996) (granting summary judgment against plaintiff because expert testimony on CCP failed to demonstrate either general or specific causation). For that reason, my decision regarding the limitations issue is not an augury of Helinski's chances for success on the merits.

### III.

Unlike Helinski's claim, the claims of the Virginia plaintiffs are not governed by Maryland's general three-year statute of limitations. Instead, Maryland's "borrowing statute" concerning product liability actions arising in foreign jurisdictions applies. Section 5–115(b) of the Courts and Judicial Proceedings Article provides:

> If a cause of action against a manufacturer or seller of a product for personal injury allegedly caused by a defective product arose in a foreign jurisdiction and by the laws of that jurisdiction the cause of action may not be maintained by reason of a lapse of time, an action may not be maintained in this State, except in favor of one who is a resident of this State.

Both parties agree that the plaintiffs are all residents of Virginia, and that their causes of action arose exclusively in Virginia. Therefore, it must be determined whether plaintiffs' claims are time-barred under Virginia law.

■ Virginia provides a two-year limitations period for personal injury actions. Va. Code Ann. § 8.01–243(A) (Michie 1993). More importantly to this case, Virginia does not follow a discovery rule, but provides that a cause of action accrues on the date the plaintiff sustains injury. Va.Code Ann. § 8.01–230. "Injury" is defined to mean "positive, physical or mental hurt to the claimant, not legal wrong to him." *Locke v. Johns–Manville Corp.,* 221 Va. 951, 957, 275 S.E.2d 900, 904 (1981). Moreover, the initial injury need only be slight to trigger the limitations period, and it is immaterial that more substantial damage may occur at a later date. *McHenry v. Adams,* 248 Va. 238, 243, 448 S.E.2d 390, 393 (1994); *see also Joyce v. A.C. & S., Inc.,* 785 F.2d 1200, 1204 (4th Cir.1986) ("Virginia courts have long applied the rule that, for purposes of the statute of limitations, there is but a single, indivisible cause of action for all injuries sustained, whether or not all the damage is immediately apparent."). Defendants claim that under this limitations framework, all of the Virginia plaintiffs' claims are time-barred.

Plaintiffs assert that their claims were not filed tardily, because of the additional time afforded them after "nonsuiting" their identical state claims. Virginia law permits a plaintiff to nonsuit, or voluntarily dismiss

---

defect. At the very least, however, Helinski had no reason to investigate any defect associated with CCP until after she learned of the probable causal link between her injuries and defendants' products.

without prejudice, her action once. Va.Code Ann. § 8.01–380. The statute of limitations is tolled by the filing of the nonsuited action, and once an order of nonsuit is issued, the plaintiff has the longer of either six months from the date of nonsuit or the remainder of the original limitations period to recommence the action. Va.Code Ann. § 8.01–229(E)(3). Plaintiffs contend that because they filed the instant federal suits nine days after nonsuiting their state actions, their federal actions are not time-barred.

Defendants maintain that plaintiffs' claims are time-barred notwithstanding the nonsuit provision, because plaintiffs were injured prior to July 23, 1991, two years before the filing of the Virginia state suits. Before considering the merits of this argument, however, I will address several other contentions raised by plaintiffs that if meritorious, would defeat defendants' motion.

### A.

Plaintiffs first claim that section 5–115(b) does not require the application of both Virginia's statute of limitations and its accrual rule to determine the timeliness of their causes of action. Plaintiffs claim that because the Virginia statute of limitations is procedural, and the date of accrual is also governed by a procedural statute, the accrual rule of the forum state should apply.

■ Plaintiffs' claim is flawed for several reasons. First, section 5–115(b) provides that a Maryland court is to look to the "laws" of the foreign jurisdiction to determine whether an action is time-barred, which implies that all of the foreign state's applicable limitations laws are to be consulted. It seems illogical to borrow Virginia's statute of limitations, but not the provision determining when the limitations period begins.

Beyond this seeming incongruity, however, it is also the majority rule that when applying a borrowing statute, the forum state is to use not only the foreign state's statute of limitations, but "all of its accoutrements as

well, whether in the form of additional statutory provisions or interpretive judicial decisions." *Duke v. Housen,* 589 P.2d 334, 345 (Wyo.1979); *see also Spitzer v. Shanley Corp.,* 151 F.R.D. 264, 266 (S.D.N.Y.1993); *Hailey v. Yellow Freight Sys., Inc.,* 599 F.Supp. 1332, 1335 n. 3 (W.D.Mo.1984); *Plumb v. Cottle,* 492 F.Supp. 1330, 1336 (D.Del.1980). When a foreign state's limitations statute is borrowed, "it is not wrenched bodily out of its own setting, but taken along with it are the court decisions of its own state which interpret and apply it, and the companion statutes which limit and restrict its operation." *Devine v. Rook,* 314 S.W.2d 932, 935 (Mo.Ct.App.1958). Thus, plaintiffs' contention is undermined by the language of section 5–115(b) and relevant precedent.

### B.

Plaintiffs also claim that section 5–115(b) violates Article IV, section II of the Constitution, as well as the due process and equal protection clauses of the Fourteenth Amendment, because it differentiates between Maryland residents and residents of other states.[5]

■ Plaintiffs first claim that section 5–115(b) infringes on the privileges and immunities of the citizens of foreign states, notably the equal right to resort to the courts of another state. As defendants point out, however, in *Canadian N. Ry. Co. v. Eggen,* 252 U.S. 553, 558–63, 40 S.Ct. 402, 403–04, 64 L.Ed. 713 (1920), the Supreme Court held that a similar Minnesota statute did not violate Article IV, section II. Plaintiffs cite no cases to the contrary.

[6] Plaintiffs further contend that section 5–115(b) violates the Fourteenth Amendment's equal protection clause. Again, plaintiffs do not cite any case considering this issue that has found a borrowing statute to be unconstitutional. By contrast, several other jurisdictions have upheld borrowing statutes that, like the one at hand, differenti-

---

5. Plaintiffs also allege violations of Articles XIX, XXIII, and XXIV of the Maryland Declaration of Rights. Because plaintiffs give no indication that analysis under these provisions is any different than under their federal counterparts, I will not address them separately. Also, while plaintiffs allege a due process violation, they do not substantiate this allegation. I will therefore disregard this putative claim.

ate between residents and nonresidents. *See Miller v. Lockett,* 98 Ill.2d 478, 485–86, 75 Ill.Dec. 224, 228, 457 N.E.2d 14, 18 (1983); *Miller v. Stauffer Chem. Co.,* 99 Idaho 299, 303–04, 581 P.2d 345, 349–50 (1978); *cf. Szlinis v. Moulded Fiber Glass Cos., Inc.,* 80 Mich.App. 55, 67–68, 263 N.W.2d 282, 288 (1977) (upholding Michigan borrowing statute that discriminated for limitations purposes between Michigan residents injured inside Michigan and Michigan residents injured outside of the state). Following these cases, I conclude that Maryland's interest in preventing forum shopping permits it to include such factors as the residence of the plaintiff in its choice of law rules.

### C.

■ Confronting the merits of defendants' limitations argument, plaintiffs assert that defendants mischaracterize their illnesses as one disease or injury, "multiple chemical sensitivity," as they are in fact suffering from numerous separate and distinct injuries. Virginia law clearly rejects this position, however, permitting a personal injury plaintiff only one cause of action for all of the injuries caused by the defendant's wrongful conduct. *Joyce,* 785 F.2d at 1204–05. Thus, even if plaintiffs' complaints can be characterized as separate injuries, as long as they all stem from exposure to CCP, they are subsumed under a single indivisible cause of action. Plaintiffs and their experts frequently describe all of their injuries as stemming from exposure to CCP, belying the claim that plaintiffs suffer from a series of unrelated ailments.

■ In evaluating when the plaintiffs suffered injury from exposure to CCP, "[t]he 'time plaintiff was hurt' is to be established from available competent evidence, produced by a plaintiff or a defendant, that pinpoints the precise date of injury with a reasonable degree of medical certainty." *Locke,* 221 Va. at 959, 275 S.E.2d at 905. As for plaintiff Miller–Jackson, the undisputed facts demonstrate that her sinus problems and fatigue surfaced as early as 1986. Two of Miller–Jackson's experts claim that her CCP-caused

injuries include fatigue and chronic sinusitis. Further, one of the experts, Dr. Grace Ziem, states that Miller–Jackson's symptoms were *exacerbated,* not caused, by a building exposure in July, 1991. Taken together, these facts indicate that Miller–Jackson was injured before July 23, 1991.

Similarly, the relevant evidence demonstrates that plaintiff Holcomb experienced sinus problems, sore throats and hoarseness soon after being exposed to CCP in 1987. Holcomb's experts conclude that reactive airway disease and chronic hoarseness are one of the injuries caused by CCP exposure. Dr. Ziem also states that the installation of a new roof in the summer of 1991 aggravated already existing symptoms. Finally, Holcomb's own "Explanation of Events Leading Up to Multiple Chemical Sensitivity for Ann B. Holcomb" indicates that she started to notice something was wrong in the summer and fall of 1990. Taken together, these facts indicate that Holcomb was also injured before July 23, 1991.

Finally, like the other two plaintiffs, the evidence indicates that plaintiff Smith experienced respiratory problems soon after being exposed to CCP in the early 1980's. Smith's experts include sinusitis and other respiratory problems in the list of injuries caused by her exposure to CCP. As with the other plaintiffs, Dr. Ziem claims that Smith's symptoms were exacerbated, not brought on, by the same July 1991 building exposure experienced by Miller–Jackson. These facts indicate that Smith was injured before July 23, 1991.

### IV.

In sum, defendants' summary judgment motion as to plaintiff Helinski is denied, because Helinski did not have knowledge of a probable causal link between her injuries and CCP until after November 15, 1990. Defendants' motion as to plaintiffs Holcomb, Miller–Jackson and Smith will be granted, however, because the relevant evidence indicates that plaintiffs were injured prior to July 23, 1991.[6] A separate order to that effect is being entered herewith.

6. Because I have found that the Virginia plaintiffs' claims are time-barred, I need not address

## ORDER

For the reasons stated in the memorandum entered herewith, it is, this 31st day of January, 1997

ORDERED

1. Defendants' motion for summary judgment as to plaintiff Mary Patricia Helinski is denied;

2. Defendants' motion for summary judgment as to plaintiffs Ann Holcomb, Mildred Miller–Jackson and Brenda Smith is granted; and

3. Judgment is entered in favor of defendants against plaintiffs Holcomb, Miller–Jackson and Smith.

defendants' additional grounds for summary judgment, concerning Virginia's refusal to recognize claims for strict product liability, and defendant Mead Corporation's independent limitations argument. Both of these grounds appear to be meritorious, however.